WILLIAM JOHNSON, PLAINTIFF-RESPONDENT, v. HOS-
PITAL SERVICE PLAN OF NEW JERSEY, A NEW JER-
SEY CORPORATION, DEFENDANT, AND CITY OF
NEWARK, A MUNICIPAL CORPORATION OF ESSEX
COUNTY, DEFENDANT-APPELLANT.

Argued September 30, 1957—Decided October 21, 1957.

*Mr. Jacob M. Goldberg* argued the cause for appellant (*Mr. Vincent P. Torppey,* Corporation Counsel, attorney; *Mr. Joseph A. Ward,* on the brief).

*Mr. Henry F. Hoey, Jr.,* argued the cause for defendant Hospital Service Plan of New Jersey (*Messrs. Braun & Hoey,* attorneys).

The opinion of the court was delivered by

WACHENFELD, J.   On April 11, 1955 Alfreida Johnson, infant daughter of plaintiff William Johnson, was struck by an automobile and suffered a severe fracture of the hip.   She was conveyed by ambulance to the Newark City Hospital, now known as Martland Medical Center, where she was admitted as an emergency case.   The hospital, a public institution owned by the municipality, is principally dedicated to the charitable care of indigents, but by virtue of an ordinance enacted in 1937, persons may be accepted for emergency treatment although they possess the financial resources to secure adequate care elsewhere.   Section 9.2 of the ordinance under consideration provides:

"Any person who shall receive emergency treatment and who is not indigent, shall be charged and pay the cost of such care and treatment at rates to be fixed by the director."

Alfreida Johnson required hospitalization and medical treatment for a total of 70 days.   Her hospital bill, computed at the normal rates for non-indigent patients as established by the medical director of the hospital, amounted to $1,190.   Only $100 of this sum was ever paid to the city, however, and this fact is at the heart of the present litigation.

During 1955 William Johnson was a subscriber to the Hospital Service Plan of New Jersey, also known in common parlance as the New Jersey Blue Cross Plan.   Under the terms of his individual contract with the Plan, his daughter was eligible for the benefits of his subscription.

The Department of Institutions and Agencies of the State of New Jersey in 1944 had approved the Newark City Hospital as a possible participant in the Hospital Service Plan.   Thereafter, negotiations were commenced for the inclusion of the Newark City Hospital as a cooperating member of the Plan.   These discussions eventuated in a purported agreement signed by the then Medical Director of the City Hospital, Dr. Earl Snavely, whereby certain fixed rates were to be paid the hospital by the Plan for the hospitalization and treatment of subscribers and eligible

members of their families. This agreement stipulated that payments made under its terms would constitute payment in full to the hospital.

The initial arrangement, made by Medical Director Snavely, provided for payment to the hospital at the rate of $5 per day for the first 21 days that a subscriber was hospitalized on an emergency basis, and for the payment of $3.63 per day thereafter for a period of not more than 90 days. Subsequently, this basic understanding was modified several times to increase the charges to the Plan, but the provision was always retained that the payment required of the Plan on behalf of any subscriber, or eligible member of his family, should constitute payment in full to the city.

At the time when Alfreida Johnson was injured the agreement with the Plan, signed by Medical Director Chmelnik, provided for payment of the flat sum of $100 per subscriber-patient regardless of the amount or quality of hospitalization required. Thus, if a subscriber to the Hospital Service Plan were taken into the city hospital as an emergency case and hospitalized for only one day, the Plan was nevertheless obligated to pay the full $100 to the hospital. Correspondingly, if 70 days of hospitalization and treatment were necessary, as here, the Plan was still obligated to pay only $100 as full compensation to the city.

In accordance with the alleged agreement entered into by its medical director, the city hospital billed the Plan in the amount of $100 for its care of Alfreida Johnson. This sum was paid by the Plan, and the city accepted the check. Meanwhile, the Johnsons had instituted a negligence action against the driver allegedly responsible for Alfreida's injuries, and a settlement of the suit had been effected. The insurance carrier for the putative tort-feasor refused, however, to pay over $1,090 of the settlement money to the Johnsons because the city had filed a hospital lien in that amount. Under *N. J. S.* 2A:44–37 such a lien attaches to the proceeds of any settlement assented to by a person who has been treated for personal injuries sustained in an accident due to the alleged negligence of another. The lien claim

filed by the city represented the difference between the original hospital bill of $1,190 and the $100 sum rendered by the Plan as payment in full of the Johnsons' obligation.

As a result of the insurance company's action, William Johnson initiated this suit for a declaratory judgment absolving him of any liability to the city for his daughter's care. He contended that either the $100 paid by the Plan to the city hospital on his behalf constituted payment in full or that, if the agreement between the Plan and the city were held invalid, the Plan was obligated to pay the amount of the lien. An agreed statement of facts was drawn by the parties, and they stipulated that under no circumstances would Johnson be liable for the sum involved.

Thus, the litigation resolved itself into a contest between the City of Newark and the Hospital Service Plan, the fundamental argument of the city being that its medical director was not authorized to enter into any contract with the Plan and that the purported agreement was therefore invalid.

The court below determined that the requisite authorization was present and that, in any event, the city had ratified the original agreement and its subsequent modifications agreed to by the respective medical directors. The judgment in favor of the Hospital Service Plan directed the Clerk of Essex County to cancel of record the hospital lien of the City of Newark. An appeal was taken by the city to the Appellate Division, but we certified the cause on our own motion before argument there.

Newark does not contend it, as a municipality, is entirely devoid of power to conclude a contract such as the one under consideration. The city concedes the agreement comes within the general scope of its corporate powers. *R. S.* 17:48–7, as originally enacted and as amended in 1954, contemplates that service contracts will be entered into between hospital service corporations, organized pursuant to the terms of *R. S.* 17:48–1 *et seq.,* and hospitals maintained by any of the political subdivisions of this State, and the parties do not advert to any reason why this authority should not

embrace a contract for a flat payment regardless of length of hospitalization such as we encounter here. The statute initially required that all rates of payment to cooperating hospitals be approved by the Department of Institutions and Agencies, and now specifies that the Commissioner of Banking and Insurance may nullify any arrangement made by a hospital service corporation if in his opinion the rate of payment provided for is excessive or inadequate. Presumably, although the record is barren in this respect, the Department of Institutions and Agencies approved the rates negotiated by the Plan and the city prior to 1954, and since then the Commissioner of Banking and Insurance has not raised any objection to the terms of the contract.

Neither does the city argue that the parties failed to comply with any mandatory formalities operating as conditions precedent to the formation of a valid contract. Compare *Hudson City Contracting Co., Inc., v. Jersey City Incinerator Authority*, 17 *N. J.* 297 (1955); *Bauer v. City of Newark*, 7 *N. J.* 426 (1951). It denies the binding force of its purported obligation to accept $100 as payment in full for the care of Alfreida Johnson solely upon the ground that the Director of the Department of Public Affairs, under the commission form of local government, and the Director of the Department of Health and Welfare, under the mayor-council form of local government in effect after July 1, 1954, were the only officials authorized to prescribe rates and to deal with the Hospital Service Plan. It is claimed the medical director of the city hospital was not the proper agent to negotiate an agreement with the Plan and that therefore Newark, as principal, is not accountable for the unauthorized acts of its agent.

In opposition, the Hospital Service Plan asserts that section 9.2 of the ordinance quoted previously gives the medical director of the city hospital explicit authority to fix rates and that its agreement, signed by the medical director, comes within the category of rate fixing.

We find it unnecessary, however, to resolve the true meaning of the word "director" as it is ambiguously used in the

ordinance, and to determine in which local official the authority to contract with the Plan resides. Even assuming the medical director was acting beyond the bounds of his authorization, it is clear that in light of the events succeeding the inauguration of the agreement the city has accepted it by ratification and is now estopped to deny its validity.

It is well established in this jurisdiction and generally conceded by the authorities that a municipality can ratify a contract entered into by an unauthorized agent as long as such contract is one within the corporate powers and not *ultra vires* in the primary sense as entirely beyond the municipal jurisdiction. *DeMuro v. Martini,* 1 N. J. 516 (1949) ; *Frank v. Bd. of Education of Jersey City,* 90 N. J. L. 273 (*E. & A.* 1917) ; *Bourgeois v. Board of Chosen Freeholders of Atlantic,* 82 N. J. L. 82 (*Sup. Ct.* 1911) ; 10 *McQuillin, Municipal Corporations* (*3d ed.* 1950), §§ 29.02, 29.103, 29.104; 38 *Am. Jur., Municipal Corporations,* § 509. See *Potter v. Metuchen,* 108 N. J. L. 447, 450–51 (*Sup. Ct.* 1931). The ratifying power exists when the deficiency invalidating the municipal contract consists only in the lack of proper authorization on the part of the party executing it in behalf of the municipality. The public is not disserved by this doctrine for the responsible officials who should properly have made the agreement are not bound by their subsequent acceptance of it through the means of ratification unless they were acquainted with all the material facts. *Frank v. Bd. of Education of Jersey City, supra; Ratajczak v. Bd. of Education, Perth Amboy,* 114 N. J. L. 577 (*Sup. Ct.* 1935), affirmed 116 N. J. L. 162 (*E. & A.* 1936) ; 10 *McQuillin, supra* at § 29.107 ; *Restatement, Agency,* § 91. Thus, the public, in large, is fully protected.

Here there was no express ratification through the adoption of an ordinance or resolution confirming the acts of the respective medical directors in making contracts with the Hospital Service Plan. The doctrine of implied ratification applies to municipalities as well as to individuals, however, and we find that the conduct of the appellant city

manifests an intention to affirm the unauthorized act of its agent.

The intent to ratify an unauthorized transaction may be inferred from a failure to repudiate it. *Restatement, Agency,* § 94. *McQuillin* states a city may be bound by inaction and that mere silence, the performance of the contract, or the acceptance of benefits under it can constitute ratification. 10 *McQuillin, supra,* at § 106. Any conduct on the part of the municipality reasonably evidencing approval of the unauthorized transaction will suffice. Thus, in *Frank v. Bd. of Education of Jersey City, supra,* the court found an implied ratification where the board of education knew that work and materials had been furnished by the plaintiff at the direction of unauthorized agents but did not deny their authority or protest the claims presented until three years after the last work had been performed. Similarly, in *Ratajczak v. Bd. of Education, Perth Amboy, supra,* it was held the school board had affirmed the unauthorized hiring of plaintiff as a janitor despite the absence of a formal resolution when for approximately three years it had paid him a salary, assigned him to janitorial duties and in every other respect treated him as a regularly employed custodian.

We think the facts *sub judice* conduce more strongly to the conclusion that an implied ratification was effected than did those in the *Frank* and *Ratajczak* cases. The city permitted the contract with the Hospital Service Plan to remain in effect from 1944 through 1956, although by its very terms the contract was terminable upon 60 days' notice by either party. Prominent is it that during this entire period and, in fact, from 1922 forward no one in the city administration other than the medical director had ever established rates for hospital care. Newark cannot contend its administrative officials were ignorant of the existence of the contract or the material facts concerning its execution and terms. The very officer charged by the City of Newark with the authority to negotiate such contracts knew of its consummation in 1944 and was also familiar with the rates which the Hospital Service Plan undertook to pay.

Commissioner Brady, who was Director of the Department of Public Affairs, having under its jurisdiction the Newark City Hospital, from 1944 to 1949, admitted in his deposition that he may have directed Medical Director Snavely to enter into an agreement with the Hospital Service Plan, and further stated he had "undoubtedly" approved any rates fixed during his term of office. The conclusion is irresistible that the contract was ratified by the official who Newark contends had the authority to make it in the first instance. Furthermore, both the present Director of the Department of Health and Welfare, under the mayor-council form of local government, and Mayor Carlin admitted that in December of 1954 at the hearings upon the proposed 1955 budget they had learned of the 1944 agreement and the modifications effected thereafter, realizing that the city was collecting a flat payment of $100 for its hospitalization and treatment of subscribers to the Hospital Service Plan. Nevertheless, no steps were taken to abrogate the arrangement and the city continued to receive benefits under it. The 1954 financial report of the city hospital showed that a portion of its receipts had been collected from the New Jersey Blue Cross Plan, and the 1955 report reflected a complete breakdown of receipts, including those from the Hospital Service Plan.

The cases cited by the city in support of its argument that no ratification occurred are easily distinguishable. In *Service Commercial Body Works v. Borough of Dumont*, 5 *N. J. Super.* 327 (*App. Div.* 1949), the court held there was no ratification by virtue of the borough's receiving a fire truck, which had been painted and lettered without authorization, and using it for six weeks prior to rejecting the plaintiff's bill. The court expressly found there was no evidence that the governing body was aware the truck had been painted without authority and noted that even if there were such knowledge, the borough was compelled to accept the truck because it was needed for fire protection. The delay in notifying plaintiff that its claim had been denied was attributed to the customary time lag incident to municipal

procedures. Likewise, in *N. J. Car Spring & Rubber Co. v. Jersey City*, 64 *N. J. L.* 544 (*E. & A.* 1900), there was nothing to indicate that the body authorized to purchase certain goods had any knowledge of their requisition or receipt and use. *Jersey City Supply Co. v. Jersey City*, 71 *N. J. L.* 631 (*E. & A.* 1905), simply holds there was no express ratification of an unauthorized purchase of goods where the mayor vetoed the ratifying resolutions adopted by the board of fire commissioners. His consent was an essential element in the ratifying process, and there could be no effective ratification without his concurrence. Again, the municipal body charged with the responsibility for making such purchases had no knowledge of their requisition or delivery and use before plaintiff's claims were presented, and therefore an issue as to implied ratification did not arise.

We are amply satisfied that if the medical directors of the city hospital were wanting in authority to transact agreements with the Hospital Service Plan, the city by its course of conduct has by this time rectified the deficiency through implied ratification.

Additionally, the doctrine of estoppel applies against municipal corporations. *Vogt v. Borough of Belmar*, 14 *N. J.* 195 (1954); 10 *McQuillin, supra,* at §§ 29.02, 29.103; 19 *Am. Jur., Estoppel,* § 168. A great injustice would be perpetrated if at this late date Newark were permitted to deny its obligations to the Hospital Service Plan. The Plan has undergone a considerable change in position as a result of its reliance upon the authority of the medical director to enter into a valid cooperating hospital agreement, and the city's continued compliance with full knowledge of the agreement is directly responsible for the Plan's payment of benefits over the course of 11 years.

*State v. Giller*, 5 *N. J. Super.* 130 (*App. Div.* 1949), is cited to refute the existence of any estoppel against the city to deny the authority of its medical directors. It merely holds, however, that a municipality is not bound by the ex-officio acts of its officers in sanctioning the viola-

tion of a zoning ordinance. Obviously, the situation here is quite different.

The city maintains the agreement with the Plan was exceedingly detrimental in that for the years 1953 through 1956 considerably less money was received under the $100 payment-in-full provision than would have been received if the regular rates established for non-indigents were charged to Plan subscribers. These figures ignore, however, the administrative ease of collectability involved in having the Plan as the sole source of payment and also fail to take into account the assurance of payment which the Plan represents. If the city hospital had no agreement with the Hospital Service Plan, the results would probably be far less beneficial. The rates payable by the Plan to the city hospital would have to be established on the basis of the average payment made by all patients treated therein, and since the great majority of them are indigent, these rates would be extremely low. If the city chose to remain outside the Hospital Plan, it would be faced with the large and often unrewarding task of collecting its obligations from each individual patient. The arrangements with the Hospital Service Plan may not have established a perfect balance of *quid pro quo,* but there can be no doubt that they were fair and reasonable and approved by disinterested state officials.

While public money must be conserved and to this end special rules govern the validity of municipal obligations, it would be grossly unjust not to make municipalities reasonably amenable to fair standards of conduct in their transactions with outsiders. It is difficult to imagine a case which more compels the application of this general standard than the case *sub judice.*

The judgment below is affirmed.

*For affirmance*—Chief Justice Weintraub, and Justices Oliphant, Wachenfeld, Burling, Jacobs and Francis—6.

*For reversal*—Justice Heher—1.