656 A.2d 853

CITIZENS FIRST NATIONAL BANK OF NEW JERSEY, A NATION-AL BANKING ASSOCIATION, PLAINTIFF–APPELLANT, v. ALFRED BLUH AND SHIRLEY BLUH, HIS WIFE, DEFEN-DANTS–RESPONDENTS, AND JASON BRODSKY AND NA-TIONAL STATE BANK, ELIZABETH, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Submitted March 27, 1995—Decided April 25, 1995.

Before Judges DREIER, VILLANUEVA and WEFING.

*Weber, Muth & Weber,* attorneys for appellant (*Andrea A. Angera, Jr.,* on the brief).

*Betsch & Bennett,* attorneys for respondents (*Robert J. Bennett, Jr.,* on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Plaintiff, Citizens First National Bank of New Jersey (Citizens), appeals from a judgment dismissing its foreclosure complaint and declaring void the subject mortgage taken as collateral for its $150,000 loan to Paul C. Cavaliere, Jr. Plaintiff initiated the foreclosure action seeking the sale of the property now owned by defendants, Alfred and Shirley Bluh. Jason Brodsky and National State Bank, Elizabeth, junior lienholders, were also named as defendants.[1]

In February 1986, Paul C. Cavaliere, Jr., Alfred Bluh, Joseph Batelli and John Warren agreed to form a partnership or joint venture, Marlboro 79 Associates, for the purposes of purchasing and developing Lots 2, 3 and 4 in Block 29 of the tax map of Marlboro Township, Monmouth County, New Jersey. Cavaliere, as attorney for the partnership, negotiated and executed a contract to purchase said real property for $1,200,000. The partnership also purchased adjoining lots. The partnership agreement set forth the partnership interests: Bluh and Batelli owned thirty-five percent each for providing the necessary financing, and Cavaliere and Warren were allotted fifteen percent each for legal and engineering services, respectively.

---

[1] In this opinion, "defendants" or "Bluhs" refer to defendants-respondents, Alfred and Shirley Bluh, "defendant" or "Bluh" refers solely to Alfred Bluh.

The property was deeded to Cavaliere as trustee on December 30, 1986. We have been given no explanation why it was deeded to Cavaliere as trustee rather than to Marlboro 79, and there is at best conflicting testimony whether Bluh and the other partners knew how the title was taken.

In October 1988, Cavaliere applied to Roy Kay, a senior lending officer of Citizens, who had known him for many years as a friend and prominent local attorney, for a $150,000 loan, offering the property as collateral. Kay informed Cavaliere that the bank could not accept the property as collateral because Cavaliere held title as trustee only. Kay claimed that Cavaliere appeared surprised that the deed was in his name as trustee. He advised Cavaliere that the property had to be in his personal name before the loan would be approved.

The partnership agreement provided that the partnership business would be conducted only "by a majority interest of the partners." Cavaliere later claimed that the partners had an understanding that they could mortgage their share of the property, but it is clear that he never obtained the specific consent of the partners either for the transfer of title to the property or for the mortgage. Neither Kay nor any other bank officer ever made any effort to determine if Cavaliere had the authority as trustee to transfer the property to himself, nor did they ask to examine a copy of any underlying trust or partnership agreement.

Cavaliere claimed that he told Kay that he had a substantial interest in the property, indicating there were other partners, although he listed the property as his own on the financial statement he submitted to the bank. According to Kay, he was not told that others had an ownership right in the property and only learned of it either when he was told by Cavaliere that Bluh would pick up the payments or when an estoppel certificate was later requested by Cavaliere on behalf of Bluh. Kay was also told that the proceeds of the short term loan would be used for investment purposes, although he later said he knew the financing

was for personal needs and that the loan was to be repaid from the proceeds of a future sale of the property.

Cavaliere prepared and signed a deed from himself as trustee to himself individually and provided a copy to Citizens. The deed was recorded, and the loan for $150,000, secured by a mortgage on the property, was made on October 14, 1988. There was no appraisal on the property, and the title binder given to the bank (there was no title policy ordered) indicated Cavaliere held the property as trustee. Additionally, the binder indicated that Cavaliere had debts including a federal tax lien at the time of the loan, although Cavaliere told him they were "satisfied."

Five months later, in March 1989, Bluh arranged with his son-in-law, Jason Brodsky, for a loan of $500,000 which was also to be secured by a mortgage on the property. The transaction was completed with the mortgage signed by Bluh and Cavaliere, as the title was still in Cavaliere's name. Cavaliere was also Bluh's attorney in the transaction. In preparation of this transaction, Bluh's inquiry to Cavaliere's office concerning the title search revealed the mortgage to Citizens by Cavaliere as a prior encumbrance on the property. Bluh claimed he did not previously know about that mortgage. He heatedly confronted Cavaliere about the mortgage and claimed he wanted to report him to the appropriate authorities, but Cavaliere assured Bluh that the $150,000 note would be paid and the mortgage discharged when it became due. This representation was accepted by Bluh since he had known Cavaliere for many years. Both Bluh's and Cavaliere's mortgages were unknown to the other two partners and violated the terms of the partnership agreement since, as noted earlier, the partnership agreement required a majority vote of the partnership to conduct business, and Cavaliere's and Bluh's combined interests equalled only fifty percent.

Bluh did not seek legal advice from other sources at the time of the Brodsky loan, nor did he notify the bank about any alleged invalidity of the loan. In fact, Cavaliere as Bluh's attorney requested an estoppel certificate from Citizens in December 1989

when Bluh again mortgaged the property.[2]  Bluh also verified at times that the payments on the loan by plaintiff were current.

Kay testified that when Cavaliere's one-year note was about to become due, Cavaliere told Citizens that he could not pay the note and that Bluh would be taking over the payments, which he never did.  When the note was due and Cavaliere did not pay it, the note was renewed with a due date of October 14, 1991.

In late 1989, Bluh applied for a loan to National State Bank for over one million dollars, to be secured by a third mortgage on the property.  Cavaliere was again retained as Bluh's attorney in this transaction.  A contemporaneous agreement between Brodsky, the Bluhs and Cavaliere dated December 28, 1989 acknowledged that the Cavaliere loan was unpaid with no defaults and prohibited any mortgages by Cavaliere or the Bluhs, other than the new National State Bank mortgage, before the Brodsky loan was paid.[3]  Both the Bluhs and Cavaliere warranted in paragraph seven of the agreement that Cavaliere had "full power and authority to execute and deliver the deed to [the Bluhs]."  Paragraph seven of the agreement also provided:

(d) A balance of $150,000.00 remains unpaid under the mortgage to Citizens First National Bank of New Jersey dated October 14, 1988 ($150,000.00) principal is payable in 1990; and there is no default existing under said mortgage, and until satisfaction of the mortgage to Brodsky, neither Cavaliere nor Borrowers will make any new borrowings under the former mortgage.

---

[2] An actual estoppel certificate is a written declaration by a mortgagor that a prior mortgage is current and that there are no defenses to the same.  *See* 13 *N.J. Practice Real Estate Law and Practice* § 20.20 at 505–506 (John A. Celantano, Jr.) (1991).  In this case, the testimony indicates that the mortgagee bank was asked by Bluh to verify the balance due and that the loan was current and that the parties considered this an estoppel certificate.

[3] The three-party agreement, prepared by Cavaliere, recited that Brodsky had loaned Bluh $500,000 secured by a mortgage signed by Cavaliere as record owner of the property and that Bluh could not pay the note when it was to become due and wished to place a third mortgage on the property in the amount of $1,053,000, in favor of National State Bank.  Brodsky permitted this new bank loan and an extension of payment terms in consideration of a $200,000 prepayment of Bluh's loan and other revised terms.

In one of the premise clauses to the agreement, the parties acknowledged that the National State Bank mortgage was to be "a third mortgage on the real property," thus also recognizing the mortgage to plaintiff. By deed dated the same day, Cavaliere, with Brodsky's permission, conveyed the property to defendants so that they could complete the National State Bank's mortgage loan transaction for $1,053,000, again using the property as collateral.

Batelli, the other partner who financed the property, later found out about the three loans, and to satisfy his objections, Cavaliere, with Bluh's consent, deeded the adjacent property owned by the partnership to Batelli. Warren, the fourth partner, left the partnership since he had not performed any of the anticipated services for the partnership. His share was divided among the other three remaining partners.

Cavaliere made payments on his loan to plaintiff until August 1991 at which time he defaulted. He filed for bankruptcy in June 1992, and Citizens filed a successful complaint for non-dischargability for the full amount of the mortgage.

Citizens then initiated this foreclosure action on the property, but the Bluhs' counterclaim sought to have the mortgage voided. Bluh claimed that he was then told by another attorney that the Citizens mortgage was invalid although he acknowledged that he already knew that. At the time of trial, the principal balance on the Citizens Bank loan was $137,509.04 with accrued interest of $23,378.13.

The trial court determined that Cavaliere had no authority to borrow money against the property without the consent of the partners. The judge further found that the original deed presented to Citizens with Cavaliere as trustee named as grantee placed a burden of inquiry on Citizens concerning Cavaliere's fiduciary capacity and the scope of his authority to borrow for personal needs. From these facts, the judge reasoned that the Citizens mortgage should be held to be void *ab initio*, the mortgage should

be discharged, and the complaint was to be dismissed with prejudice.

## I

In his decision, the judge referred to *Petras v. Zaccone,* 125 *N.J.Super.* 474, 311 *A.*2d 751 (App.Div.1973), for the proposition that the bank owed a good faith effort of inquiry into Cavaliere's authority to transfer the property to himself individually and to borrow funds using the property as collateral. In *Petras,* defendant obtained a personal loan from plaintiff, and then later defendant gave plaintiff a bond and mortgage, which he held as executor of an estate, in repayment of the loan. *Id.* at 476, 311 *A.*2d 751. This court determined that

[t]he law exacts good faith from those dealing with knowledge of the representative capacity of another and imposes the obligation to make inquiry into the propriety of a transaction when it appears that the security offered is not being applied for the benefit of the estate. When one ignores·a plain duty to make a full and complete inquiry, then he must accept the responsibility and liability his neglect or want of vigilance entails.

[*Id.* at 477, 311 *A.*2d 751 (citations omitted).]

Since in *Petras* there was no good faith inquiry by plaintiff, the ordered foreclosure was reversed.

Such cases are fact sensitive. In *Foster v. Dey,* 27 *N.J.Eq.* 599 (E. & A.1876), relied upon in *Petras v. Zaccone, supra,* an assignee of a mortgage from a trustee was found not to have had knowledge of any misdeeds by the trustee.

[T]itle can only be defeated by evidence showing that, at the time of the assignment, he [the assignee] knew that the trustee contemplated a breach of trust, and intended to misapply the money, or was, by the very transaction, applying it to his own private purposes.

[*Id.* at 600.]

*See also Goodell v. Monroe,* 87 *N.J.Eq.* 328, 100 *A.* 238 (E. & A.1917) (transaction was invalid where the bank knew that the executor was assigning the bond and mortgage to himself without consideration, trusting that he would pay the estate the money owed).

■ A bank has notice of a breach of trust "when [it] has actual knowledge of the breach or when [it] has knowledge of such facts that [it] should ascertain by inquiry whether the trustee is committing a breach of trust." 4 *Scott on Trusts* § 297 (3d ed. 1967). When a loan is made with property as collateral and the one lending has *any reason* to know that the property is trust property, inquiry should be made concerning the "authority of the trustee to sell or mortgage or pledge it." *Id.* at § 297.4. There is no absolute protection, even if the deed does not indicate the property is held in trust.

> [A] transferee is not protected if the transfer was made in breach of trust and if the transferee had reason to know that the property was held in trust and that the transfer was in breach of trust. The circumstances may be such as to indicate the existence or at least the possible existence of a trust sufficiently to put the transferee on inquiry. If he suspected that the property was held in trust but closed his eyes and made no attempt to ascertain the correctness of his suspicions, he is obviously chargeable with notice.
>
> [*Id.* at § 297.3.]

■ In the present case, plaintiff certainly had reason to know that the property might be held in trust. The bank officer had seen the deed with Cavaliere as trustee listed as grantee. The actual rejection of the first deed with Cavaliere as trustee showed knowledge of the trust. When Cavaliere returned with a deed listing himself individually, the bank had sufficient knowledge of the facts to cause it to inquire whether Cavaliere had the authority to transfer the deed to himself, especially since the transfer apparently was without actual consideration as the deed was transferred for consideration of one dollar.[4]

Although plaintiff now asserts that it had no knowledge the borrowed funds might be misapplied, Kay indicated that he knew the funds were for Cavaliere's personal use. If Cavaliere did not have the authority as trustee to transfer the deed, the use of the funds for personal purposes would be a further breach of his

---

[4] *N.J.S.A.* 46:15–6 and 46:15–5(c) requires the actual consideration to be recited in the deed or in an annexed affidavit of consideration. Failure to do so is a disorderly persons offense. *N.J.S.A.* 46:15–9.

fiduciary duties. The bank only needed to have made a good faith effort of inquiry into the status of the property to have revealed the true facts. It is of no consequence that *Petras* dealt with an antecedent debt. The knowledge that Cavaliere was a trustee and that the proceeds were going to be used for personal needs leads to the same conclusion of law in both *Petras* and this case.

Additionally, if Cavaliere is to be believed, plaintiff knew that Cavaliere was a partner in the joint venture that owned the property, although his partnership interest was not as substantial as he claimed. If plaintiff had asked to see the agreement to determine if Cavaliere had the authority to encumber the property, it would have seen he did not. There were, therefore, enough facts ascertained at the time Cavaliere requested the loan under his own name to have put the bank on notice that it must make a good faith inquiry into the true ownership of the property and Cavaliere's right to encumber it.

## II

Plaintiff next claims that there was no trust established, and thus Cavaliere would have no fiduciary duties as a trustee.[5] He was merely a partner in a joint venture. In order to establish a trust, certain elements are required. "The issue of trust or no trust turns almost invariably on proof of intention, since the trust arises upon mere expression of the requisite intention." *Eagles Bldg. and Loan Ass'n v. Fiducia*, 135 *N.J.Eq.* 7, 9, 37 *A.*2d 116 (Ch.Div.1944), *aff'd*, 136 *N.J.Eq.* 117, 40 *A.*2d 627 (E. & A.1945).

---

[5] Defendant asserts that this issue was not raised in the pretrial conference, and no evidence to support such a contention was raised at the trial. Plaintiff also failed to note in its brief, as required by *R.* 2:6–2, that the issue was not raised below. Although no injustice would be done if this issue were not considered on appeal, we will nevertheless briefly discuss it. *R.* 2:10–2.

Additionally, defendants assert in their brief that plaintiff took a contrary position about Cavaliere's ability to encumber the property in a motion for non-dischargability in Cavaliere's bankruptcy case. If this were true, judicial estoppel would apply, but there is no evidence in the record to confirm this contrary statement.

"A trust is created only if the settlor properly manifests an intention to create a trust." *Restatement (Second) Trusts* § 23 (1959). Plaintiff, therefore, maintains that Cavaliere could not have been a trustee because there was no intention to create an express trust. This in and of itself is true.

The issue, however, is not whether there was in actuality a trust, but whether the bank should have assumed there was a trust and made a good faith inquiry into Cavaliere's authority as trustee or otherwise to take title personally and mortgage the property.

> [W]here a conveyance of land is made to a person "trustee," but there is nothing further to indicate the existence of a trust ... the form of the instrument is held sufficient to indicate that the land is or may be held in trust, and a transferee of the property is not entitled to ignore the form of the instrument.
>
> [4 *Scott on Trusts, supra,* at § 297.3.]

The bank had every reason to believe a trust existed, and the circumstances of the transaction required that it inquire as to Cavaliere's authority to transfer the property to himself and then encumber the property.

■ As a partner in a joint venture, Cavaliere had the right only to encumber his interest in the partnership. He held no separate interest in the partnership's assets. *Montgomery Nat'l Bank v. Sullivan,* 265 *N.J.Super.* 102, 105, 625 *A.*2d 576 (App.Div. 1993), cited by plaintiff is inapposite. That case dealt with the right of a co-tenant not a partner in a joint venture.

■ Absent an agreement to the contrary, any partner can act as an agent of the partnership when "apparently carrying on in the usual way the business of the partnership...." *N.J.S.A.* 42:1–9. Here, however, there was an agreement that superseded the statute. Paragraph eleven of the Joint Venture Partnership Agreement gave "full authority to direct and manage the Joint Venture Partnership [only if] ... conferred by a majority interest in the Partnership." Cavaliere claimed that there was an "understanding" between the partners that the property could be encumbered, but there is no proof of that. He, therefore, had no

authority to encumber the property without the consent of a majority of the partnership, which he never sought.

Furthermore, Cavaliere's title to the property that properly belonged to the partnership was actually that of a trustee since the law implies a trust when a person accepts title to property properly belonging to another. *D'Ippolito v. Castoro*, 51 *N.J.* 584, 588, 242 *A.*2d 617 (1968); *Hirsch v. Travelers Ins. Co.*, 134 *N.J.Super.* 466, 470, 341 *A.*2d 691 (App.Div.1975). The bank's position on this issue, therefore, was totally incorrect, whether it raised the issue in a timely manner or not.

### III

As noted earlier, the judge determined that the mortgage was void *ab initio.* An unauthorized transaction, however, can be ratified in these circumstances, and the transaction would therefore be only voidable. An invalid act may be validated or ratified if "exacting standards" are met. *In re Estate of Lange*, 75 *N.J.* 464, 479, 383 *A.*2d 1130 (1978). Ratification must be made with "full knowledge of all the relevant facts and full appreciation of what was being done." *Ibid.* The party must be " 'fully apprised of the effect of the acts ratified, and of his or her legal rights in the matter.' " *Id.* at 480, 383 *A.*2d 1130 (quoting *In re Ryan's Will*, 291 *N.Y.* 376, 52 *N.E.*2d 909, 920 (1943), quoting *Adair v. Brimmer*, 74 *N.Y.* 539, 553–54 (1878)).

"The intent to ratify an unauthorized transaction may be inferred from a failure to repudiate it." *Johnson v. Hospital Serv. Plan of N.J.*, 25 *N.J.* 134, 141, 135 *A.*2d 483 (1957) (citing *Restatement, Agency* § 94). But in most circumstances inaction or silence by a principal will not ratify the agent's unauthorized act "unless it is shown that the principal did nothing or said nothing after he was fully informed of what his agent has done." *Chetwood v. Berrian*, 39 *N.J.Eq.* 203, 209 (Ch. 1884), *aff'd*, 39 *N.J.Eq.* 517 (E. & A.1885) (condoning the agent's acts and continuing a relationship with him constituted ratification of the fraudulent acts).

The rule is settled that where the silence of a principal may cause loss to a third person, or give him an advantage, he must, without unreasonable delay after the fact comes to his knowledge that his agent has exceeded his authority, disown his agent's act and afford the other party an opportunity to protect himself, or he will make his agent's act his own.

[*Id.* at 210.]

Bluh learned of the Citizens mortgage in March 1989 when he also was seeking to encumber the same partnership property without majority consent. At that time he gained full knowledge of the relevant facts concerning the mortgage. He was aware that the Citizens mortgage would have first priority and that the mortgage could be claimed to be invalid, and yet he allegedly did nothing to enforce the rights of the partnership. His knowledge of the impropriety of Cavaliere's actions is demonstrated by his alleged threat to go to the appropriate authorities to undo the transaction or to proceed against Cavaliere. His later acquiescence is demonstrated by the December 1989 agreement and his continuing use of Cavaliere as his attorney in his two mortgage transactions. At that time, when Warren was no longer a partner, Bluh and Cavaliere having a majority interest in the property, had the capacity to ratify the mortgage through their actions.

Bluh claims that he was not aware of his legal rights until 1992 when he finally consulted an attorney, although he admitted that he knew at the time he learned of the mortgage that it was invalid because Cavaliere did not own the property. In recognition of that earlier knowledge, Bluh sought an estoppel certificate as assurance that Cavaliere was making timely payments. Although he obviously knew that what Cavaliere had done was improper as revealed by Bluh's threat to go to the authorities, he had already mortgaged the property to his son-in-law, and he was again about to do the same thing in favor of National State Bank. He may not have known specifically that he could have the mortgage to plaintiff discharged, but he apparently knew enough about the situation to seek legal assistance to put the property in his and his wife's names and effect the new substantial loan for his own benefit.

As this point was not specifically reached by the trial judge, we cannot know what other factors may influence a factual finding concerning ratification. On remand the issue should be thoroughly explored.

## IV

Plaintiff also claims that the Bluhs are equitably estopped from denying the first mortgage.[6] The party asserting a claim of equitable estoppel has the burden of proof, and

the claiming party must show that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action. Further, the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment.

[*Miller v. Miller*, 97 *N.J.* 154, 163, 478 *A.*2d 351 (1984) (citations omitted).]

The offending conduct must amount to

misrepresentation or concealment of material facts, known to the party allegedly estopped and unknown to the party claiming estoppel, done with the intention or expectation that it will be acted upon by the other party and on which the other party does in fact rely in such a manner as to change his position for the worse. It is a doctrine designed to prevent a party's disavowal of previous conduct if such repudiation "would not be responsive to the demands of justice and good conscience."

[*Carlsen v. Masters, Mates & Pilots Pension Plan Trust*, 80 *N.J.* 334, 339, 403 *A.*2d 880 (1979) (citations omitted).]

Plaintiff could have assumed that Bluh's lack of protest indicated that nothing was wrong and that Cavaliere's authority to transfer the property to himself and encumber the property on behalf of the partnership had been confirmed. This issue together with any of Bluh's defenses also should be explored on remand.

## V

Plaintiff also belatedly raises the issue of the waiver of the Bluhs' rights. "'Waiver' is the intentional relinquishment of a

---

[6] Defendants assert that the issue of equitable estoppel was also not raised in the trial court. We will also consider this issue as a proper subject of the plain error rule. *R.* 2:10–2.

known right. It is a voluntary act, 'and implies an election by the party to dispense with something of value, or to forego some advantage which he might at his option have demanded and insisted on.'" *West Jersey Title and Guar. Co. v. Industrial Trust Co.*, 27 *N.J.* 144, 152, 141 *A*.2d 782 (1958) (quoting *George F. Malcolm Co. v. Burlington City Loan & Trust Co.*, 115 *N.J.Eq.* 227, 170 *A.* 32 (Ch.1934)). " 'Waiver' presupposes a full knowledge of the right and an intentional surrender; waiver cannot be predicated on consent given under a mistake of fact." *Id.* at 153, 141 *A.*2d 782.

Plaintiff asserts that the Bluhs' failure to challenge the validity of the mortgage indicated a waiver. After Bluh learned of the mortgage, he only insisted that Cavaliere continue making the payments. He seemed to want to help out an old friend and continued to employ him as his attorney. Bluh could have then sued to invalidate the mortgage which was a first lien on the property, but he objected to the validity of the mortgage only when Cavaliere defaulted. Whether Bluh's inaction, coupled with the expressions of acceptance of plaintiff's mortgage in the December 1989 agreement, constituted a clear, unequivocal and decisive waiver is an additional issue of fact which was not explored by the trial judge, and which must likewise be considered on remand.

In sum, we affirm the trial judge's determination that plaintiff was on notice that Cavaliere acted as a trustee in apparent breach of his obligations to his partners in general and to Bluh in particular. This breach of trust, however, could have been ratified or waived or the Bluhs could have been estopped from raising the breach. These issues must be explored on remand. The foreclosure complaint should not have been dismissed until these issues were resolved. The judgment, therefore, must be reversed and the matter remanded for retrial on the open issues in accordance with this opinion.