**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4987-17T2

WHITESELL ENTERPRISES, LLC,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

KENNETH LONG, KATHLEEN
LONG, and JONATHAN
SHEVELEW,

      Defendants,

and

JOHN SCHEFFEY,

      Defendant/Cross-Appellant.

Argued January 9, 2020 – Decided April 8, 2020

Before Judges Alvarez, Nugent and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law
Division, Burlington County, Docket No. L-2397-14.

William G. Wright argued the cause for appellant/cross-respondent (Capehart & Scatchard PA, attorneys; William G. Wright, on the briefs).

Lawrence P. Powers argued the cause for respondent/cross-appellant (Hoagland Longo Moran Dunst & Doukas, attorneys; Lawrence P. Powers, of counsel; Richard J. Mirra, of counsel and on the briefs).

PER CURIAM

Plaintiff Whitesell Enterprises, LLC, appeals a February 2018 jury verdict, as captured on the verdict sheet, that defendant John Scheffey's "action or lack of action" demonstrated "an intent to ratify" his forged signature on a personal guarantee for a commercial lease. The jury nonetheless found he did not owe $179,981.63 in unpaid rent because his "conduct or silence" did not benefit him or harm Whitesell. We vacate the jury's verdict, as we find Scheffey should have been granted summary judgment dismissing him from the case and, for the same reasons, a directed verdict. The question of his liability should have never reached the jury.

Before the jury trial, Whitesell filed three amended complaints, finally amending the third amended complaint to add Scheffey as a defendant after he was dismissed from the first complaint by way of a motion in lieu of answer. See R. 4:6-2. Whitesell's cause of action against Scheffey was amended to allege that even if he did not personally sign the lease guarantee, he either

authorized another to sign on his behalf or failed to repudiate his signature—thus "by his inaction, and/or by his acceptance of the benefits of [the lessee's] occupancy and use of the leased premises . . . ratified or adopted his signature on the guarantee."

We have no copy of the transcript or documents regarding the motion to dismiss in lieu of answer, granted on May 8, 2015. Nor do we have copies of the moving papers or a transcript regarding the trial judge's decision to allow the amendment to the third party complaint.[1] All we know is that the amendment anchored the cause of action against Scheffey on the theory of ratification "by inaction" and "acceptance of the benefits."

Turning to Scheffey's summary judgment motion, the statement of material facts included the undisputed fact that when the lease was negotiated he was only an investor with the company and was never involved in the day-to-day operations. Scheffey knew nothing about the terms of the lease, or the lease negotiations, and his signature was forged on the personal guarantee. He did know the company was moving to a new location. We assume from

---

[1] The order allowing the amendment to the third complaint was not provided in the record, so we do not know the exact date Whitesell's motion was granted. Whitesell filed the amendment on November 7, 2016.

A-4987-17T2

references in the record the motion in lieu of answer was granted because Scheffey's signature was forged.

The person who acknowledged the signature, defendant Jonathan Shevelew, did not witness Scheffey signing the document. Shevelew acted first as a consultant for the tenant, Solular, eventually becoming Chief Executive Officer in June 2011. He stated in an affidavit submitted with the motion for summary judgment: "it is entirely possible that [Shevelew] signed as a witness to the lease guarantee without seeing [Scheffey] actually sign in person." Shevelew also stated that at the time he mistakenly believed Scheffey was a "partner" in Solular, a limited liability company, the named tenant on the commercial lease.

Scheffey did not acquire an ownership interest in the company, a 20.2 percent share of 100 units, until approximately six months after the lease was signed. Even then, he did not review the lease terms.

When the lease was signed, Kenneth Long,[2] also a named defendant in this lawsuit, was Solular's president and ran the business. Kenneth also owned

_____

[2] We refer to Kenneth Long and Kathleen Long by their first names to avoid confusion. No lack of respect is intended by the usage.

A-4987-17T2

a 20.2 percent interest in the company. In a letter to Whitesell's counsel regarding rent arrears, dated October 3, 2014, Kenneth said:

> . . . Scheffey and Kathleen . . . did not sign the personal guarantees in the lease for the facility. I realize they were owners and knew of the unit being leased by Solular, but they were not apprised of their having to personally sign on this lease. One of our other partners signed for them. They are engaging counsel to defend this so this will present another legal front for you to address. I have nothing to do with their actions as they are not owners of the firm any longer.
>
> . . . .
>
> I am pretty sure the responsibility of attending to paying Whitesell will fall to me since I am the only one remaining who actually did sign the personal guarantee.

In the selection from Kenneth's depositions attached to Scheffey's statement of material facts, Kenneth explains the letter as meaning that he never saw Scheffey sign the lease and knew no one who had. Kenneth understood that he was the only one personally responsible for the lease and denied that the letter was an admission that he forged Scheffey's signature. Kenneth filed for bankruptcy before the trial, but the court did not discharge his obligation to

Whitesell, presumably because of the falsification of signatures, and the unauthorized submission of documents to the landlord.[3]

The lease was signed in December 2010. Scheffey acquired his ownership interest in Solular in May 2011. By then he had invested approximately $300,000, including guaranteeing a company credit line. As required during the credit line application process, Scheffey provided Solular with a copy of his 2009 tax return. The tax return would later be given to Whitesell without Scheffey's knowledge or consent. It was included with the documents submitted by Solular in the lease negotiation process.

In the summer of 2011, Scheffey installed a mock-up in the Solular warehouse at the leased premises of a bank interior Scheffey's separate business was proposing to construct. He hoped not only to succeed in getting the building contract, but that by using the Solular premises, the bank might become interested in using Solular's services. Scheffey's project occupied the Solular warehouse premises some three or four months. Whitesell's amendment to the third amended complaint alleges in general terms that Scheffey gained the

---

[3] The record includes mention of the fact Kenneth's obligation under the lease was not discharged in bankruptcy. The appendix does not include any pertinent documentation.

benefit of the leased premises—it is not clear if the benefit alleged referred to this use or Solular's occupancy over the years.

Without identifying the source of the information, Whitesell responded to Scheffey's statement of material facts that he knew as of December 9, 2010, the date the lease was signed, "that [Whitesell] was requiring the 'principals' of Solular to personally guarantee the lease." It is undisputed that on December 6, 2010, a representative for Whitesell sent the proposed lease to Shevelew. Shevelew forwarded this email to Kenneth and Kathleen, another Solular partner whose signature was also forged, requesting that they meet to review the terms of the lease. On December 7, Kathleen forwarded that email to Scheffey while also discussing charitable contributions from Solular. Shevelew had also sent a December 6, 2010 email calling a meeting of owners to review the terms of the lease.

Scheffey ignored the proposed unsigned lease attached to the second email because he was not an owner, had no involvement in day-to-day operations, and had not been approached about it by anyone. He assumed since he was an investor that he was merely being kept informed of important developments, like with the information regarding charitable donations. Scheffey's records

7

established he was actually traveling out-of-state the month the lease was signed.

In March 2014, Scheffey learned about the forgery when Kenneth sent him a copy of the fully executed lease, warning him that Solular had been unable to pay the rent. Scheffey immediately recognized that his signature had been forged and immediately told Kenneth. Kenneth responded that perhaps the witness to the signature, Shevelew, had signed it.

In July 2014, Whitesell informed Kenneth, as the business manager, that the lease was in default. In August, Whitesell sent letters to all the guarantors, including Scheffey, advising them of their obligations under the lease. In September, they were further advised by Whitesell's attorneys that the payments were being accelerated, and that Solular and the personal guarantors were in default. In response, Scheffey retained counsel. When asked at trial for the reason he did not inform Whitesell in August of the forgery, Scheffey testified that Kenneth assured him he was negotiating with Whitesell to sublease the property to another company, so the rent would be paid.

In his deposition, Shevelew acknowledged no one signed the lease guarantees in his presence, despite "witnessing" all the signatures on the document. Shevelew remembered telling Scheffey when the lease was signed

A-4987-17T2

that all the Solular "partners" had to personally guarantee payment.  Shevelew at the time believed that Scheffey was a partner, and thus assumed Scheffey knew about the obligation.  Scheffey did not recall any such conversation, but because he was not a partner, even if it had occurred, he testified he would not have thought anything of it because at the time he had no ownership interest in the company.

On July 6, 2017, the trial judge denied the motion for summary judgment. The following is her decision on the subject, which we reproduce in its entirety:

> Nonetheless, I think that there are issues of material fact in this case [and] that this needs to be resolved by a jury.  It can go either way.  But for the purposes of summary judgment, and the activity of Mr. Scheffey at the outset, his interest in the corporation, the notice that he was supposed to be a guarantor, no indication -- it doesn't appear to be any resistance to that when the lease was being prepared.  In addition, he occupied some of the premises for a portion of the time.
>
> He didn't disavow it immediately once he came to the conclusion that it was forged.  In addition, the jurors can look at the signature and determine if it's forged.  He can have his testimony and the jury can decide.  But there's many issues of fact that preclude the Court from granting the motion for summary judgment.  It doesn't mean he might not succeed in trial, but the Court cannot grant summary judgment as to that issue.

The trial court denied Scheffey's motion for a directed verdict. See R. 4:37-2(b). Her opinion included a discussion of relevant cases as well as the following:

> They -- let me say this, a jury could infer that at the point in time in March when . . . Scheffey learned about it, it was to his benefit to have Solular continue to operate. And if they didn't have the lease or if they were evicted at that point in time, there was no benefit to Solular continuing to operate and perhaps pay him back. That is quite clearly an obvious possibility, and the jury can conclude that.
>
> In addition, Mr. -- and maybe the jury will accept that . . . Scheffey was willing or preparing to negotiate favorable terms to extricate himself from this. And had they notified Whitesell and gotten evicted there would be less opportunity for him to get any benefit from this LLC, which he was trying to get out of. In addition it came out during cross, Mr. Grace should know, did Mr. Field tell you that part of that agreement that you wanted to come in came -- basically the gist of that agreement came in on cross of . . . Scheffey. And it became relevant at that point in time because . . . Scheffey made certain statements.
>
> So that's -- in addition, it's hard to conceive that . . . Scheffey -- he is a businessman, a very successful businessman. It's inconceivable to the Court, and maybe to the jury -- the jury -- maybe the jury will accept this, that the partners -- and it's interesting that the partners – . . . Shevelew referred to . . . Scheffey as a partner, and I guess the partnership agreement came after the fact. But, nonetheless, . . . Shevelew knew or considered . . . Scheffey a partner and therefore there

was knowledge that a guarantee would be required. So that's an issue that the jury can consider in addition.

So . . . Scheffey is partner in Solular LLC. They are operating out of this warehouse. They -- he benefits from the mock-up. He's benefitting from the lease.

## I.

Both Whitesell and Scheffey raise a number of points on appeal and cross-appeal related to the law of agency and ratification, based on alleged errors in the jury instruction and the verdict sheet. We address only two points raised in Scheffey's cross-appeal, that the court should have granted summary judgment and a directed verdict.

The familiar standard as to summary judgment requires us to apply the same analysis as did the trial court. Bhagat v. Bhagat, 217 N.J. 22, 38 (2014). If the moving party demonstrates there are no genuine issues of material fact, then we address whether the moving party is entitled to judgment as a matter of law. Ibid. All legitimate factual inferences are drawn in favor of the non-moving party. R. 4:46-2(c).

Addressing just the first portion of the test, and even drawing all favorable factual inferences in Whitesell's favor, it is undisputed that Scheffey's signature was forged. He flatly alleges in his certification that he did not even know his name was on the document until years after the lease was signed. Whitesell

11

produced no one who saw him sign his name, or any person who contradicted his ignorance of the lease terms. Whitesell's focus in opposition to summary judgment was Scheffey's purported ratification of his signature by his months-long silence after learning of the forgery. That Scheffey was silent for several months over the spring and summer is also an undisputed fact.

But as a matter of law, in order for Whitesell to establish that Scheffey's silence constituted ratification, Whitesell would first have to prove that he had made some other person his agent to act for him within the company, thus triggering the possibility that the ratification doctrine would apply. Whitesell did not present any such proof when summary judgment was denied, or at any time thereafter for that matter.

At the time the lease was signed, Scheffey had invested some $300,000 in the company, but that was the extent of his involvement. He was not legally liable for the rent. He had no ownership interest when the lease was signed, played no role in the management of the company or its day-to-day operations, and was not paid a salary. Solular's limited liability organizational structure was designed to protect owners, and should have done so here.[4]

---

[4] N.J.S.A. 42:2C-30 states that the "debts, obligations, or other liabilities" of a limited liability company are solely those of the company. They do not become

Scheffey's limited use of Solular's warehouse, his only personal use of the premises, does not expose him to liability for the unpaid rent. His use was a convenience to an investor who had sunk substantial sums in the business without yet seeing a return. Absent from the record is any suggestion that Scheffey vested or authorized anyone to legally bind him to company obligations.

The cases cited by both parties on appeal, and the trial judge, relating to ratification, all assume an agency relationship between principal and agent. In Chetwood v. Berrian, 39 N.J. Eq. 203, 209 (Ch. 1884), the first reported opinion in New Jersey regarding the ratification doctrine, the agent had been granted broad powers, in writing, as attorney-in-fact for his principal while the latter was abroad. The ratification by silence doctrine was applied because the agent engaged in unauthorized and damaging transactions which the principal did not repudiate. Id. at 210.

In Thermo Contracting Corp. v. Bank of New Jersey, 69 N.J. 352 (1976), a more complex relationship existed between principal and agent—however, the

---

a personal obligation of a member of an LLC "solely by reason of the member acting as a member . . . ." Ibid. Even when an LLC does not observe particular formalities relating to the exercise of its management powers, personal liability cannot be imposed on members. Ibid.

complexity substituted for a specific designation of agency. Thermo, a general contractor, brought suit against a bank for its wrongful deposit of checks payable to Thermo on the forged signature of Kashulines, a subcontractor working for Thermo. Id. at 356. After discovering the wrongful deposit, Thermo continued to do business with Kashulines for months on various unrelated jobs, and continued to be paid a twenty-five percent management fee, despite the fact Kashulines was not making good on his promises to repay Thermo for the misappropriated checks. Id. at 357-59. Kashulines had been given physical access to checks issued to Thermo on prior occasions. Id. at 356. It behooved Thermo to continue to do business with Kashulines because, not only did it believe Kashulines would reimburse the checks, it knew that if Kashulines was pressed, he would stop working on Thermo jobs, and the company needed him to do so in order to be paid. Id. at 359. The intertwined business relationship was the basis for the Court's application of the ratification by silence doctrine in finding the bank was not liable for its deposit of checks bearing Kashulines's forged endorsement. Id. at 362.

Thermo is also factually distinguishable. Scheffey was a passive investor, and a passive owner, who had no involvement or engagement with the company

14

other than the expectation his investment would eventually be returned with interest. He made no ongoing income from Solular's business activities.

In Citizens First National Bank of New Jersey v. Bluh, 281 N.J. Super. 86 (App. Div. 1995), another case cited by both parties, a real estate investment partnership was formed between several individuals, including an attorney. The attorney was designated by the partnership to act in its behalf, and in fact the attorney was named as the trustee of the partnership. Id. at 89-90. The deed to certain partnership real property was placed in his name as trustee, which he used for personal gain. Id. at 90. While the partnership agreement limited his authority to act on behalf of the partnership, he clearly acted with apparent authority as an agent of the partnership. Id. at 90-91.

In In re Dweck, No. 7-11757, 2010 W.L. 2196417 (Bankr. D.N.J. June 1, 2010),[5] a husband and wife gave their nephew millions of dollars to invest for them and in their names. They continued to invest with him even after discovering he had committed a fraud involving a mortgage and note that they

---

[5] We recognize that this court generally does not cite to unpublished opinions. R. 1:36-3; see also Glukowsky v. Equity One, Inc., 360 N.J. Super. 1, 28 (App. Div. 2003), rev'd on other grounds, 180 N.J. 49 (2004). However, a brief discussion is warranted because both parties relied on the case and it was discussed extensively by the trial court. It does not constitute precedent nor is it binding upon this court. We discuss it for sake of completeness.

had not authorized. Again, in that case, unlike this, the principals gave their agents apparent or actual authority, which the agents later abused.

Whether the doctrine of ratification is characterized as equitable or arising out of contract law, as argued by the parties, is irrelevant here. The doctrine is premised on an agent/principal relationship. Whitesell had no fact or law from which to argue that Scheffey's silence over a few months effectively created an agency relationship where none previously existed. A principal/agent relationship requires conduct that would have given the third party reason to believe the agent had the authority to act on behalf of the principal. Whitesell at that juncture assumed Scheffey had personally signed the lease.

The Restatement of Agency defines agency as "the fiduciary relationship that arises when one person . . . manifests assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2006). Clearly no fiduciary relationship between Scheffey and whomever forged his signature existed. Scheffey never manifested assent for an agent to sign the lease on his behalf. He never read the lease, did not know of its terms, and was not even in the state at the time the lease was signed. There was no foundational agency relationship

16

to justify the trial court's imposition of the ratification by silence doctrine.  See id. at § 4.01.

In her summary judgment decision, the judge glossed over the undisputed forgery.  She did not explain the legal basis upon which a jury might conclude that Scheffey's silence amounted to ratification of the forged signature.  If Whitesell's claim rested on the doctrine of ratification, which requires an agency relationship, the existence of the agency relationship needed to be at least raised.  It was not.  Opposition to the motion skipped that step altogether.

The judge should have granted Scheffey's motion, even viewing plaintiff's facts in the most favorable light.  Scheffey did not at any time designate anyone to act as his agent.  Based on the business structure of Solular, Scheffey had every reason to believe he would be protected from personal liability for debts of the business, should it fail.  The forgery of his signature exposed his personal assets to collection of a debt precisely along the lines of what the limited liability statute was intended to prevent.

Nor did the judge's decision denying the motion for summary judgment explain the reason Scheffey's three- or four-month use of a warehouse—the only use he made of the premises over several years—might be dispositive, or why she otherwise found that there was any conflict of material fact.  In reality, there

was no genuine issue of material fact and as a matter of law, Scheffey was entitled to dismissal of the third amendment to the third complaint.

In the absence of any proof of an agency relationship, or the appearance of one, as a matter of law, the motion should have been granted.

II.

Scheffey contends for the same reasons his motion for directed verdict should have been granted. We apply the same standard as applicable to the trial courts. Prioleau v. Kentucky Fried Chicken, Inc., 434 N.J. Super. 558, 569 (App. Div. 2014). "Under Rule 4:37-2(b), a motion for a directed verdict is granted only if, accepting the plaintiff's facts and considering the applicable law, 'no rational jury could draw from the evidence presented' that the plaintiff is entitled to relief." Ibid. (quoting Pitts v. Newark Bd. of Educ., 337 N.J. Super. 331, 340 (App. Div. 2001)).

In light of the absence of any proof of an agency relationship as a matter of law, no properly charged rational jury could have found in favor of Whitesell. At the time the motion for directed verdict was made at the close of Whitesell's case, additional facts had been developed which made denial of the directed verdict motion even more problematic. For example, Kenneth's bankruptcy proceedings did not discharge him for the debt to Whitesell. The bankruptcy

court determined at least that Scheffey's forged signature and reliance on Scheffey's income tax return when negotiating with Whitesell over the lease without Scheffey's knowledge or consent, did not allow for discharge of the accelerated lease payments.

Even if we were to conclude, which we do not, that an agency relationship existed, Scheffey's silence could not, at the close of Whitesell's case, be construed by a reasonable jury as ratification of the forged signature. His silence, for as many months as the silence in the Thermo case, was contingent upon his understanding that Kenneth was going to pay the debt. Such a payment would have not changed Scheffey's status but would have benefitted Whitesell.

In denying the motion for directed verdict, the judge appears to have said that ratification was a contract principle. She reiterated the definition as being the affirmance by a person of a prior act which did not bind him but which was professedly done on his account so as to give third parties the impression it was originally authorized by him. This definition should not apply to a forgery where the forger never held himself out as the agent of the principal prior to the wrongful act.

The judge equated Scheffey's silence with the hope he could extricate himself from a failed business on "favorable terms." The terms, however, would

have been favorable only to Whitesell while neutral to Scheffey, an owner protected by the structure of the limited liability company. The judge also relied on Shevelew, who did not actually witness any signatures and who claimed, mistakenly, that he believed Scheffey was a partner when the lease was signed. She also mentioned Scheffey's use of Solular's warehouse and said that it bordered on the "inconceivable" that he would not have known he was on the lease. When counsel reminded the judge that no one alleged Scheffey had knowledge of the lease terms, she did not directly address counsel's correction, only stating that she was "not satisfied that there's no benefit to . . . Scheffey."

Essentially, the judge's decision appears to have been grounded on her mistaken belief that Scheffey knew about the personal guarantee language in the lease. This error of fact, and her enumeration of other possibilities, was not the analysis the directed verdict rule requires. Furthermore, as a matter of law, she assumed an agency relationship when none existed. She should have granted Scheffey's motion.

Accordingly, we reverse on the cross-appeal and do not reach Whitesell's points on appeal. The motion for summary judgment should have been granted, as should the motion for directed verdict.

A-4987-17T2

We vacate the jury's verdict, reverse denial of the summary judgment and directed verdict motions, and dismiss the complaint as to Scheffey.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4987-17T2