NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2884-12T4

JANICE J. PRIOLEAU,

     Plaintiff-Respondent,

v.

KENTUCKY FRIED CHICKEN,
INC. and KFC CORPORATION,

     Defendants,

and

YUM BRANDS, INC. and
KFC U.S. PROPERTIES, INC.,

     Defendants-Appellants.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **March 3, 2014** |
| **APPELLATE DIVISION** |

Argued October 30, 2013 – Decided March 3, 2014

Before Judges Sapp-Peterson, Lihotz and Hoffman.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-5817-10.

Beth A. Carter argued the cause for appellants (Bennett, Bricklin & Saltzburg, L.L.C., attorneys; Ms. Carter, of counsel and on the briefs).

Glenn A. Montgomery argued the cause for respondent (Montgomery, Chapin & Fetten, P.C., attorneys; Mr. Montgomery, of counsel; Gary Ahladianakis, on the brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

Defendants Yum Brands, Inc. and KFC U.S. Properties, Inc. appeal from a jury verdict awarding plaintiff Janice J. Prioleau damages for injuries suffered from a fall on defendants' restaurant premises. Defendants maintain the trial judge erred in denying their motion for a directed verdict. Alternatively, defendants argue erroneous jury instructions and incorrect evidential determinations require the verdict be set aside and a new trial granted.

Following our review, we affirm the denial of defendants' motion for a directed verdict. However, we agree that use of the mode-of-operation liability jury charge was erroneous, warranting reversal. Accordingly, we vacate the verdict and remand for a new trial.

I.

The facts are taken from the record of the three-day jury trial. Early in the evening of December 26, 2009, between 5 and 6 p.m., plaintiff, who was traveling with her adult children Richard and Adriana, stopped in the Cherry Hill KFC restaurant owned and operated by defendants.

Plaintiff and her children confirmed the weather was "very bad," it was "pouring" rain, and there was "a torrential storm."

Plaintiff entered the restaurant without aid of an umbrella. Further, plaintiff recalled she and her children "were wet[,]" her jacket, clothing and sneakers were soaked, and the family "tracked water in[to]" the restaurant.

When the family entered the premises, only one other customer was in the dining area. Initially, plaintiff did not notice water or "wetness" on the restaurant's floor. Her son and daughter strode to the counter to place their order and plaintiff headed toward the restroom. Approximately five feet from the restroom, plaintiff started "to slip and slide like [she] was on ice." She fell, extending her arms and hands to brace her fall and avoid banging her knees, and landed on her buttocks. Richard attempted to assist plaintiff, but he "started to slip[,] also." Adriana "ran over also and tried to guide [plaintiff] up[, but] she started to slip." Then, the male patron seated nearby helped plaintiff rise from the floor.

During trial, plaintiff described the floor's surface, stating: "It was just like a sheet of ice. It was slippery. It was wet. And when I fell, that's what I came up was on my clothes [sic]." Plaintiff said the floor felt like "grease . . . and water." On cross-examination, plaintiff expounded, exclaiming: "I felt it was wet first. It was

slippery. And . . . when we first started sliding is when [sic] I realized that it was grease mixed with water."

She and her children were approached by Debbie Lovato, the restaurant's assistant manager. Richard informed Lovato plaintiff had slipped. She declined medical attention stating "[i]t wasn't that serious." Plaintiff and her family ate their food and left.

Plaintiff did not feel any immediate pain resulting from her fall; she "figured [she] would be okay." However, Adriana drove home to Newark, Delaware because plaintiff "was in too much pain." Upon arriving in Newark, plaintiff sought treatment at Christiana Hospital's emergency room and was discharged the same day. Two weeks later, on January 11, 2010, she consulted her family doctor. As a result of the accident, plaintiff injured her neck, back, and hands; experienced numbness in her left leg; and tingling in both arms and her left foot. She underwent a CT scan of her lumbar spine, which revealed disc bulges and arthritis at L1-2, L2-3, L3-4, and L4-5, as well as a herniation in L5-S1. She declined spinal injections and surgical intervention, and attended physical therapy a few days a week for approximately two months.

Plaintiff suffered no lost wages, acknowledging she returned to work without missing any time, despite the physical

demands of her occupation. Plaintiff last received medical treatment in August 2010.

On cross-examination, defendants attempted to inquire into plaintiff's prior medical treatments for her back and neck. Plaintiff had testified she only had prior difficulties with her knee. Defendants, intending to impeach plaintiff's testimony, questioned her regarding medical care undertaken to treat her lumbar spine in 2002. The judge sustained plaintiff's objection, precluding the use of plaintiff's prior medical records during cross-examination.

Additional evidence introduced by plaintiff included excerpts from deposition testimony of defendants' employees. Mark Loveless, the loss prevention manager, described various company policies. He stated a warning sign is used if floors are wet and there is a general requirement to monitor the customer floor area for water or spills. Michelle Abdou, the restaurant's general manager, admitted no policy required the floor to be mopped periodically throughout the day, rather it was mopped in the evening and in the event of a spill, or if water was tracked in by customers. Further, when a floor is wet, warning signs are placed at the affected site. Cheryl Lynn Gross, an area coach and Abdou's supervisor, described how the restaurant cooks chicken in open split vat fryers and pressure

cookers. She noted oil is used in the cooking process. During kitchen operations in the Cherry Hill restaurant, the kitchen floor is mopped two to three times per day and also if there is a spill. When asked whether someone on the cook line could get oil on their footwear, Gross responded "possibly." Acknowledging employees access the same restrooms as customers, Gross was asked whether kitchen workers with soiled footwear could track oil to the restroom. Again she responded, "possibly." At her deposition, Lovato testified that dining area tables were wiped every half-hour and the restrooms were checked when the tables were wiped. Lovato admitted she was unaware of any entries recording an inspection of the restaurant floor in the four hours preceding plaintiff's fall. She had not personally performed inspections, nor could she remember who was working that day that may have done so.

Plaintiff presented expert testimony from Allan D. Tiedrich, MD, an expert in physical medicine and rehabilitation and orthopedics. He discussed his review of plaintiff's medical records and the examination he performed on September 13, 2010. During cross-examination, defendants established Dr. Tiedrich had not been provided with plaintiff's pre-accident treatment records and attempted to use the records to question him, including a 2007 lumbar x-ray. The trial judge allowed limited

6

questions regarding Dr. Tiedrich's knowledge of the prior treatment, but precluded the use of the documents or his examination of the earlier x-ray.

Abdou and Lovato testified for defendants. Abdou was not working the day of plaintiff's fall. She described the restaurant's layout, including the six-table dining area, the order counter, restrooms and the location of the two entrances. Abdou testified both customer entrances have "big[,] heavy" floor mats "built into the tile of the floor" and a rubber floor mat over those mats. Another large rubber mat was located in front of the soda machine.

Lovato explained she arrived at the restaurant at 2 p.m. and did not notice anything on the dining area floor. During her shift, she did not see any substances on the floor and no one complained the floor was wet or greasy. The restaurant does not have a specific policy requiring periodic inspection or mopping of the dining area floor during the day. However, when the floors are mopped, the mops are "color coded" and specific to the kitchen and the dining area. On the day of the incident, defendants' records contained no entry recording a floor inspection prior to plaintiff's accident.

After learning of plaintiff's accident, Lovato attempted to speak to plaintiff, and learned she was in the restroom. In

accordance with company policy, Lovato apologized to plaintiff and offered to compensate the family for their meal.

Lovato visually examined the location where plaintiff fell and saw no water, grease or other substance on the floor. However, she acknowledged she did not physically touch the floor. She maintained the floor in front of the ladies room was not greasy or it would have been cleaned. She further stated she could survey the dining area floor from the order counter. Lovato insisted there were no spills on the floor, stating if water or grease was on the tile floor it is visible because "it shines." She also explained team members wipe the dining area tables every half-hour and check the dining room and no problems were reported.

After the incident, "as a precautionary measure," Lovato erected a caution cone outside the restroom, which remained there until the restaurant closed. Immediately after speaking with plaintiff, Lovato called the company hotline to report the incident.[1]

At the close of evidence, defendants moved for a directed verdict, arguing plaintiff failed to identify the substance on which she slipped and had not established "any notice to the defendant[s]." The trial judge denied the motion.

---

[1] The report was introduced into evidence, but is not included in the record.

During the charge conference, defendants objected to the inclusion of a mode-of-operation liability charge. The judge overruled the objection and included the doctrine in the jury's instructions.

The jury returned a verdict in favor of plaintiff, awarding $250,000 and finding defendants 51% negligent. Final judgment for plaintiff was entered in the amount of $138,643.09, which included $11,143.09 in prejudgment interest. This appeal ensued.[2] Defendants' request to stay enforcement of the judgment pending appeal and file a supersedeas bond, Rule 2:9-5(a) and (b), was granted.

## II.

On appeal, defendants challenge the denial of the motion for directed verdict, the inclusion of the mode-of-operation liability charge, and the preclusion of plaintiff's past medical records during cross-examination. We examine these issues.

## A.

Defendants contend a directed verdict should have been granted at the close of evidence because plaintiff produced no proof of defendants' actual or constructive notice of the

---

[2] Defendants timely electronically filed their notice of appeal. An extension for filing was granted because the system did not transmit the notices.

dangerous substance on the premises, or even exactly what substance was on the floor. We disagree.

In reviewing an order granting or denying a motion for directed verdict, "we apply the same standard that governs the trial courts." Frugis v. Bracigliano, 177 N.J. 250, 269 (2003). Motions for directed verdict at the close of trial, R. 4:40-1, are governed by the same standard as motions for involuntary dismissal, pursuant to Rule 4:37-2(b). As applied here, we must accept as true all evidence presented by plaintiff and the legitimate inferences drawn therefrom, to determine whether the proofs are sufficient to sustain a judgment in her favor. Monaco v. Hartz Mountain Corp., 178 N.J. 401, 413 (2004). "[T]he judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969).

Under Rule 4:37-2(b), a motion for a directed verdict is granted only if, accepting the plaintiff's facts and considering the applicable law, "no rational jury could draw from the evidence presented" that the plaintiff is entitled to relief. Pitts v. Newark Bd. of Educ., 337 N.J. Super. 331, 340 (App. Div. 2001). See also R. 4:37-2(b) ("[A] motion shall be denied if

the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor."). "[I]f reasonable minds could differ, as to whether any negligence has been shown, the motion should be denied." Bozza v. Vornado, Inc., 42 N.J. 355, 357-58 (1964) (citing Bell v. E. Beef Co., 42 N.J. 126 (1964)).

"In general, '[b]usiness owners owe to invitees a duty of reasonable or due care to provide a safe environment for doing that which is in the scope of the invitation.'" Stelluti v. Casapenn Enters., LLC, 408 N.J. Super. 435, 446 (App. Div. 2009) (quoting Nisivoccia v. Glass Gardens, Inc., 175 N.J. 559, 563 (2003)), aff'd 203 N.J. 286 (2010). "The duty of due care requires a business owner to discover and eliminate dangerous conditions, to maintain the premises in safe condition, and to avoid creating conditions that would render the premises unsafe." Nisivoccia, supra, 175 N.J. at 563 (citing O'Shea v. K. Mart Corp., 304 N.J. Super. 489, 492-93 (App. Div. 1997)). See also Arroyo v. Durling Realty, LLC, 433 N.J. Super. 238, 243 (App. Div. 2013). Such a duty is imposed because "business owners 'are in the best position to control the risk of harm.'" Hojnowski v. Vans Skate Park, 187 N.J. 323, 335 (2006) (quoting Kuzmicz v. Ivy Hill Park Apartments, Inc., 147 N.J. 510, 517 (1997) (citations omitted)).

To recover for injuries suffered, in addition to establishing a defendant's duty of care, a plaintiff must also establish the defendant had actual or constructive knowledge of the dangerous condition that caused the accident.[3] Nisivoccia, supra, 175 N.J. at 563 (citing Brown v. Racquet Club of Bricktown, 95 N.J. 280, 291 (1984)). "An inference [of negligence] can be drawn only from proved facts and cannot be based upon a foundation of pure conjecture, speculation, surmise or guess." Long v. Landy, 35 N.J. 44, 54 (1961).

"Proof of a fall alone would not be adequate to create an inference of negligence . . . ." Simpson v. Duffy, 19 N.J. Super. 339, 343 (App. Div.) (citations omitted), certif. denied, 10 N.J. 315 (1952). This is because the mere existence of a dangerous condition does not, in and of itself, establish actual or constructive notice. Arroyo, supra, 433 N.J. Super. at 243 (citing Sims v. City of Newark, 244 N.J. Super. 32, 42 (Law Div. 1990)). Liability for injuries caused by premises defects is imposed when a plaintiff establishes a defendant knew or had the reasonable opportunity to discover and correct the defect. Brown, supra, 95 N.J. at 291. "Whether a reasonable opportunity

---

[3]    A common law cause of action for negligence has four elements: (1) a duty of care owed to plaintiff by defendant, (2) a breach of that duty by defendant, (3) proximate cause, and (4) actual damages. Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 400 (2009). The plaintiff bears the burden of proving each of these elements. Ibid.

to discover a defect existed will depend on both the character and duration of the defect." Ibid. Consequently, a business owner will be liable for injuries sustained by an invitee caused by a dangerous condition on the premises "if . . . the dangerous condition . . . existed for such a length of time that he should have known of its presence." Bozza, supra, 42 N.J. at 359 (citations omitted).

Defendants argue no testimony established actual or constructive notice of the alleged greasy and/or wet floor, defeating plaintiff's assertion of negligence. Plaintiff responds, maintaining the facts proved defendants had constructive notice of the floor's hazardous condition or, alternatively, that notice is inferred because of the nature and operation of the business itself.

Following our review, we reject defendants' contention as we conclude the proofs, when viewed in a light most favorable to plaintiff, sufficiently evince defendants' constructive notice of a wet or possibly greasy floor. We save for later our discussion of the applicability of mode-of-operation liability to these facts.

Plaintiff's evidence showed she felt the floor where she fell and found it wet, greasy and slippery. Further, she noticed the substance was transferred to her clothing. Her

13                                                         A-2884-12T4

daughter and son also experienced the slippery floor as they went to plaintiff's aid. Testimony demonstrated it was raining heavily throughout the day, which circumstantially proves rain-soaked customers entered the restaurant. Although mats were placed at public entrances, no mats were on the floor in front of the restrooms and plaintiff testified no mats were at the entrance on the day of the accident. Employees, including kitchen employees using grease for frying, used the same restroom facilities as did the customers, through a common entrance. Defendants admitted they had no established policy requiring floors to be inspected periodically, and Lovato confirmed no inspection or mopping occurred during the four hours before plaintiff's accident. Finally, despite plaintiff's fall, Lovato performed only a visual inspection of the site; she did not physically touch the floor.

Having considered the proofs as a whole, we determine they are sufficient to allow a rational jury to evaluate whether the condition of the floor existed for a period of time such that had defendants exercised reasonable attention to inspect the floor's condition, defendants' employees would have learned of the danger and undertaken remedial action. Therefore, defendants' motion for a directed verdict was properly denied.

A-2884-12T4

B.

Defendants next challenge the jury charge. Specifically, defendants argue the judge failed to properly inform the jury of plaintiff's obligation to prove notice of the alleged hazardous condition. Moreover, defendants maintain the judge erred in directing notice was unnecessary if defendants' mode of operation created the hazardous condition. We conclude the court misapplied mode-of-operation liability. Because the charge had the capacity to mislead the jury, we vacate the judgment, reverse the verdict, and remand for a new trial. Ruiz v. Toys R Us, Inc., 269 N.J. Super. 607, 613 (App. Div. 1994).

In reviewing challenges to jury charges, we do not criticize small parts of the charge, but examine the charge "as a whole" to determine whether it "'adequately conveys the law and is unlikely to confuse or mislead the jury[.]'" Mogull v. CB Commercial Real Estate Grp., 162 N.J. 449, 464 (2000) (quoting Fischer v. Canario, 143 N.J. 235, 254 (1996)). The charge must "'set forth an understandable and clear exposition of the issues.'" Ibid. (quoting Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 210 (1984)). Reversal of a verdict is warranted if an instruction lacks evidential support, is likely to mislead the jury, and will cause an unjust result. Mandal v. Port Auth. of N.Y. & N.J., 430 N.J. Super. 287, 296 (App. Div.),

15                                                    A-2884-12T4

certif. denied, 216 N.J. 4 (2013).  See also Finderne Mgmt. Co., Inc. v. Barrett, 402 N.J. Super. 546, 576 (App. Div. 2008) ("Erroneous instructions on a material part of the charge are . . . presumed to be reversible."), certif. denied, 199 N.J. 542 (2004).

The law recognizes "certain distinctive instances" where the nature of self-service business operations may result in dangerous conditions to invitees.  Arroyo, supra, 433 N.J. Super. at 244.  "The rule is a very limited exception to the traditional rules of business premises liability. . . . " Carroll v. N.J. Transit, 366 N.J. Super. 380, 389 (App. Div. 2004) (emphasis added).  When applicable, an injured plaintiff is relieved of proving actual or constructive notice where, "as a matter of probability, a dangerous condition is likely to occur as the result of the nature of the business, the property's condition, or a demonstrable pattern of conduct or incidents."  Nisivoccia, supra, 175 N.J. at 563.

The mode-of-operation doctrine is an extension of the general principle that when a proprietor creates a dangerous condition, "notice, actual or constructive, of [that] dangerous condition is not required . . . ."  Craggan v. IKEA U.S., 332 N.J. Super. 53, 61 (App. Div. 2000) (citations omitted).  See also Smith v. First Nat. Stores, 94 N.J. Super. 462, 466 (App.

Div. 1967) ("Notice, either actual or constructive, is not required where a defendant . . . creates a dangerous condition."). More specifically, the mode-of-operation doctrine provides:

> [W]hen a substantial risk of injury is inherent in a business operator's method of doing business, the plaintiff is relieved of showing actual or constructive notice of the dangerous condition. The plaintiff is entitled to an inference of negligence, shifting the burden of production to the defendant, who may avoid liability if it shows that it did all that a reasonably prudent man would do in the light of the risk of injury the operation entailed. Thus, absent an explanation by defendants, a jury could find from the condition of the premises and the nature of the business that defendants did not exercise due care in operating the establishment, and that said negligent operation was the proximate cause of the injuries. The ultimate burden of persuasion remains, of course, with the plaintiff.
>
> [Nisivoccia, supra, 175 N.J. at 564-65 (internal citations and quotation marks omitted)].

See also Model Jury Charge (Civil), 5.20F(11), "Notice Not Required When Mode of Operation Creates Danger" (1970).

Our review of the authority applying mode-of-operation liability does not support a conclusion that the doctrine applies merely because a defendant operates a type of business. Rather, the unifying factor in reported opinions is the negligence results from the business's method of operation,

A-2884-12T4

which is designed to allow patrons to directly handle merchandise or products without intervention from business employees, and entails an expectation of customer carelessness. Craggan, supra, 332 N.J. Super. at 62. When mode-of-operation liability has been applied, courts have examined whether the defendant's identified business operations encompassed self-service facilities that led to a risk of harm to the plaintiff.

In Bozza, the plaintiff's fall occurred when she slipped on a "sticky," "slimy" substance, on the "littered" and "dirty" floor, that also contained "drippings, paper straw holders, napkins and dirt" at the counter eating area in the "self-service cafeteria type" restaurant located within the defendant's store. Bozza, supra, 42 N.J. at 358. Although not invoking the phrase "mode of operation," the Court

> pointed out that spillage by customers was a hazard inherent in that type of business operation from which the owner is obliged to protect its patrons, and we held that when it is the nature of the business that creates the hazard, the inference of negligence thus raised shifts the burden to the defendant to "negate the inference by submitting evidence of due care."
>
> [Nisivoccia, supra, 175 N.J. at 564 (quoting Bozza, supra, 42 N.J. at 360).]

The Supreme Court concluded:

> Thus, we believe that when plaintiff has shown that the circumstances were such as to create the reasonable probability that the

A-2884-12T4

dangerous condition would occur, he need not also prove actual or constructive notice of the specific condition. Factors bearing on the existence of such reasonable probability would include the nature of the business, the general condition of the premises, [and] a pattern of conduct or recurring incidents.

[Bozza, supra, 42 N.J. at 360).]

The Wollerman Court was the first to employ the phrase "mode of operation" when discussing the risk of injury caused by a business practice. Wollerman, supra, 47 N.J. at 429. The plaintiff was injured when she slipped on a loose string bean on the grocery store floor where the store's produce displays allowed customers to select items from the open bins. Id. at 428. The Court found these facts presented a sufficient probability "to permit such an inference in the absence of evidence that [the] defendant did all that a reasonably prudent man [or woman] would do in the light of the risk of injury his operation entailed" because "greens . . . sold from open bins on a self-service basis," creates "the likelihood that some will fall or be dropped to the floor." Id. at 429. The Court stated:

If the operator chooses to sell in this way, he must do what is reasonably necessary to protect the customer from the risk of injury that mode of operation is likely to generate; and this whether the risk arises from the act of his employee or of someone else he invites to the premises. The operator's vigilance must be commensurate with that risk.

[Ibid. (citations omitted).]

The Supreme Court next reviewed the doctrine in <u>Nisivoccia</u> and concluded the plaintiff was entitled to a mode-of-operation instruction where a grocery store patron slipped on a grape near the checkout area, rather than in the produce aisle. <u>Nisivoccia</u>, <u>supra</u>, 175 <u>N.J.</u> at 561. The Court held:

> A location within a store where a customer handles loose items during the process of selection and bagging from an open display obviously is a self-service area. A mode-of-operation charge is appropriate when loose items that are reasonably likely to fall to the ground during customer or employee handling would create a dangerous condition.
>
> . . . .
>
> [B]ecause of the way the grapes were packaged, they could easily have fallen out when accidentally tipped or upended in a shopping cart anywhere in the store. The open and air-vented bags invited spillage. It was foreseeable then that loose grapes would fall to the ground near the checkout area, creating a dangerous condition for an unsuspecting customer walking in that area.
>
> [<u>Id.</u> at 565.]

The factual scenarios giving rise to mode-of-operation liability examined by this court similarly reflect business entities that allowed customers to assume tasks, making it reasonably foreseeable customer carelessness would create a dangerous condition. Thus, the business was on notice of the inherent risk created by its business practice, warranting an

20

inference of negligence with a corresponding shift in the burden to the defendant-business to prove it acted with due care.

In Craggan, the plaintiff, a contracted delivery driver, became entangled on discarded string the defendant provided to customers to secure merchandise removed from the store. Craggan, supra, 332 N.J. Super. at 58. This court determined:

> [The] plaintiff was injured by conditions in the loading area implemented by [the defendant] IKEA to facilitate removal of merchandise by patrons who had elected to transport merchandise in their own vehicles. IKEA's mode of operation to facilitate self-service removal of purchased items created a reasonable probability that the string would not be properly coiled in its container after each use, would accumulate in the loading area, and create a tripping hazard for anyone using the area.
>
> [Id. at 63.]

In Ryder v. Ocean Cnty. Mall, 340 N.J. Super. 504 (App. Div.), certif. denied, 170 N.J. 88 (2001), we reversed a directed verdict for the defendant in the plaintiff's action for injuries suffered when she slipped on a spilled drink outside the food court area while holiday shopping. Id. at 507-08.

We found the defendant did

> not restrict the carrying of, or consumption of, food and drink anywhere in the common areas of the Mall. Indeed, near the planter where [the plaintiff] fell, patrons are accustomed to sit and eat. . . . Given that mode of operation, the Mall becomes the functional equivalent of a cafeteria. It

A-2884-12T4

was not uncommon to get reports of one or more spills every day and more spills are reported on weekends and during the holiday season. The Mall, therefore, can reasonably be charged with notice that food and drink spills are likely to occur and do occur anywhere and at any time in the common areas.

[Id. at 509.]

In Znoski v. Shop-Rite Supermarkets, Inc., 122 N.J. Super. 243 (App. Div. 1973), this court rejected application of mode-of-operation liability where the plaintiff was injured by a youth who failed to control a metal shopping cart provided to customers by the defendant. Id. at 247-248. We examined the duty imposed on the defendant by furnishing the carts, but also observed they did not create a hazardous method of business operations, stating: "We are unable to say that a substantial risk of injury is implicit, or inherent, in the furnishing of shopping carts to patrons by a store proprietor. Shopping carts are not dangerous instrumentalities, and they are uniquely suitable for the purpose for which furnished." Ibid.

Understanding the parameters of mode-of-operation liability, we emphasize the need to examine the facts of each individual case. Turning to the facts presented here, we first consider the basis articulated by the trial judge to include a mode-of-operation liability charge.

A-2884-12T4

During the charge conference, plaintiff argued mode-of-operation liability applied. See Model Jury Charges (Civil), 5.20F(11), "Notice Not Required When Mode of Operation Creates Danger," (1970). Plaintiff mentioned the floor was greasy, grease was used in the restaurant's food preparation, and Gross acknowledged grease "possibly" could have been tracked onto the customer floor area by a kitchen employee on the way to the restroom. Plaintiff next suggested defendants' business operation lacked a definitive policy requiring the floor to be inspected at set intervals. The judge considered these assertions, adding defendants' business was a "fast food store . . . and a lot of people tracking in and out." He further found defendants' safety policy required the use of a warning cone when it rained. The judge concluded: "Putting that all together I think there's [sic] enough facts to make the inferences and the arguments to the jury." Accordingly, the judge applied mode-of-operation liability and overruled defendants' contrary objection.[4]

---

[4] The mode-of-operation charge included in the jury instructions was as follows:

> A proprietor of business premises has the duty to provide a reasonably safe place for his or her customers. If you find the premises were in a hazardous condition[,] . . . whether caused by defendant[s'] employees or by others[,] such

The conclusion that these facts invoked mode-of-operation liability was unfounded and erroneous. Mode-of-operation liability does not apply merely because defendants operated a

---

as . . . other customers and if you find that said hazardous condition was likely to result from the particular manner in which defendant[s'] business was conducted and if you find that defendant[s] failed to take reasonable precautions to prevent the hazardous condition[] from arising or failed to take reasonable measures to discover and correct such hazardous condition, then defendant[s are] liable to plaintiff.

In these circumstances defendant[s] would be liable even if defendant[s] and his or her employees did not have actual or constructive knowledge of the particular unsafe condition[,] which caused the accident and injury. A proprietor business premises has the duty to provide a reasonably safe place for his or her customers. If you find that a hazardous condition was likely to arise in a particular manner in which defendant[s'] business was conducted and that defendant[s'] employees probably were responsible either in creating such a hazardous condition or permitting it to arise or to continue, defendant[s are] liable to plaintiff if defendant[s] failed . . . to exercise reasonable care to prevent such hazardous condition from arising or failed to . . . exercise reasonable care to discover and correct such hazardous condition.

In these circumstances defendant[s] would be liable even if defendant[s] and his or her employees did not have actual or constructive knowledge of the particular unsafe condition[,] which caused the accident and injury.

24                                               A-2884-12T4

fast food restaurant. Rather, plaintiff must establish a causal nexus between the fast food or other business operation and the harm causing her injuries.

Contrary to the trial judge's conclusion, defendants' business as a "fast-food operation" has no relationship to plaintiff's fall. There is no link between the manner in which the business was conducted and the alleged hazard plaintiff slipped on or its source. No testimony showed the alleged wet/greasy floor was the result of a patron's spilled drink or dropped food. Further, there was no evidence the restaurant's floor was ill-kept, strewn with debris or laden with overflowing trash.

Our dissenting colleague suggests we have narrowed mode-of-operation liability to apply solely "to businesses where customers use self-service facilities." Post at __ (slip op. at 6). Every reported opinion applying mode-of-operation liability in fact examines the self-service aspect of the defendant's business operations, which was found to have created the hazardous condition, causing the plaintiff's injury. From this we conclude the self-service mode-of-operation has resulted in the doctrine's development. Again, mode-of-operation liability results when a plaintiff suffers injury because the mode or manner of the business operation creates the dangerous condition

25                                                    A-2884-12T4

on the premises. This concept does not lead to broad application. Although mode-of-operation can cause a dangerous condition, resulting in the owner's liability, not all dangerous conditions arising in the operation of a business satisfy the mode-of-operation theory of liability. It is on this point that we part company with the views expressed in the dissent. Therefore, mode-of-operation liability is distinguishable from liability imposed when an owner creates or fails to remove a known dangerous condition on premises, such as found in Smith, supra, 94 N.J. Super. at 466.

When determining whether mode-of-operation liability exists, it is a mis-characterization to label a type of business, such as the trial judge did here, as invoking the doctrine. Just because a business is a fast-food restaurant or has self-service facilities does not prompt mode-of-operation liability. To trigger mode-of-operation liability, a plaintiff must identify facts showing a nexus between the method or manner in which the business is operated when extending products or services to the public, and the harm alleged to have caused the plaintiff's injury.

The additional facts identified by the dissent fail to establish a business operation that created an inherently dangerous risk warranting inclusion within the narrow scope of

mode-of-operation liability. Although defendants' restaurant used oil to prepare fried food and spills occurred at times in the kitchen area, these facts do not implicate customer conduct in the operation of the business, which is the rationale underlying application of the mode-of-operation doctrine. Even after adding Gross's testimony, as cited by the dissent, post at ___ (slip op. at 1-2), the facts at best raise a mere possibility that the greasy floor resulted from a kitchen employee. The comments do not "create the <u>reasonable</u> probability that the dangerous condition would occur[,]" <u>Bozza</u>, <u>supra</u>, 42 <u>N.J.</u> at 360 (emphasis added)). <u>See also</u> <u>Craggan</u>, <u>supra</u>, 332 <u>N.J. Super.</u> at 58 ("[The defendant]'s mode of operation to facilitate self-service removal of purchased items created a <u>reasonable probability</u> that the string would not be properly coiled in its container after each use, would accumulate in the loading area, and create a tripping hazard for anyone using the area." (emphasis added)).

In reaching his conclusion, our dissenting colleague relies solely on this court's holding in <u>Smith</u>, <u>supra</u>, 94 <u>N.J. Super.</u> at 466. We cannot abide such a rationale because the facts in <u>Smith</u> are distinguishable from those here presented, and, in concluding defendant created a dangerous condition on

27

its property, the Smith court did not apply mode-of-operation liability.

In Smith, the plaintiff slipped on sawdust located on a stairwell used to access the restroom. Id. at 464. "There was evidence that prior to the accident sawdust was commonly observed upon the stairway[.]" Ibid. Sawdust was used on the floor of the meat department and in the produce department. Id. at 465. The stairs were five feet from the store's meat department. Id. at 464. "[E]mployees used the stairway about seven or eight times a day, or a total of 180 times a day for all employees." Id. at 465.

We determined, "the evidence was such that a jury could legitimately conclude that the greasy, slippery state of the stairway in reasonable probability resulted from the tracking of the sawdust upon the stairway -- not by customers -- but by defendant's own employees." Id. at 466. Thus, the plaintiff was not required to prove the defendant had notice of the condition because its employees created the dangerous condition. Ibid. (citations omitted).

In Smith, the issue before the trial court was whether the defendant had constructive notice of the hazardous condition of the stairway. Smith, 94 N.J. Super. at 466. The trial judge applied the holding in Bozza, stating plaintiff's proofs created

"the reasonable probability that the dangerous condition did occur" from the defendant's conduct. <u>Ibid.</u> In our review of this determination, we expressed "doubt of [the] complete applicability [of the doctrine] to the facts of this case." <u>Ibid.</u> We continued:

> In <u>Bozza</u>, the culpable conditions arose from the conduct of customers of defendant's restaurant and cafeteria. The court in effect held that there inhered in the nature of defendant's operation a foreseeable hazard that the floor would become littered and therefore that notice, actual or constructive, was not required.
>
> Here, as we have indicated, the evidence was such that a jury could legitimately conclude that the greasy, slippery state of the stairway in reasonable probability resulted from the tracking of the sawdust upon the stairway — not by customers — but by defendant's own employees. Notice, either actual or constructive, is not required where a defendant through its agents and employees creates a dangerous condition. <u>Compare</u> <u>Torda v. Grand Union Co.</u>, 59 <u>N.J. Super.</u> 41 (App. Div. 1959), <u>Plaga v. Foltis</u>, 88 <u>N.J. Super.</u> 209, 212 (App. Div. 1965).
>
> [<u>Ibid.</u>]

It is important to note we did not find the conduct of the defendant's employees in tracking sawdust on the stairway fit within the narrow exception of mode-of-operation liability, even though <u>Wollerman</u>, <u>supra</u>, 47 <u>N.J.</u> at 426, which defined the doctrine, had been decided by the Court a year earlier. Rather,

in Smith, like this case, the facts presented issues of negligence unrelated to defendants' mode of operation.

This record is devoid of proof plaintiff fell on grease caused by defendants' fry cook who used the restroom. Plaintiff could not identify with any certainty the substance she thought caused her fall, alternating her description of the foreign substance between grease and water. The evidence marshalled by plaintiff may tend to show defendants had constructive notice that the restaurant floor was greasy. Moreover, even if the record revealed the fry cook used the restroom prior to plaintiff's fall and, in doing so, tracked grease onto the floor area leading to the restroom, the mode-of-operation doctrine would not apply. The doctrine's focus is not upon the conduct of the establishment's employees. Rather, the focus is upon the business model that encourages self-service on the part of the customer, which can reasonably and foreseeably create a risk of harm to the customer. Nisivoccia, 175 N.J. at 564.

The specific facts identified by plaintiff and the judge during the charge conference, as listed in the dissent, address defendants' duty to guard against wet/greasy floors and invoke defendants' duty to periodically inspect the customer dining area floor for foreign substances. So too, defendants' alleged inaction or ineffective conduct despite the heavy downpour may

tend to prove constructive notice of an unattended wet floor (although we note, contrary to the judge's statement, there was no testimony of a high volume of traffic in the restaurant and plaintiff herself testified there was only one patron present).

Unlike the precedents we have discussed, plaintiff cannot identify defendants' business practice that created an implicit or inherent danger likely to cause the resultant injury she sustained. See e.g., Znoski, supra, 122 N.J. Super. at 247 (holding the defendant's provision of shopping carts to customers does not trigger mode-of-operation liability in the plaintiff's action for injury caused when a youth struck him with a cart).

This same analysis holds true if the foreign substance is water. The bulk of plaintiff's evidence suggested water from the rain and possibly from her own wet shoes and clothing caused her fall. She produced no evidence showing, as a matter of probability, the presence of rain water on defendants' restaurant floor was "likely to occur as a result of the nature of the [defendants'] business, the property's condition or a demonstrable pattern of conduct or incidents." Nisivoccia, supra, 175 N.J. at 563. That defendants failed to erect a warning sign or inspect the floor supports her claim of

negligence, but not mode-of-operation liability, making use of that jury instruction error.

We, therefore, decline to paint with the same broad brush used by our dissenting colleague, who suggests defendants' actions or omissions in the course of operating a business must be attributed to its mode-of-operation. Post at __ (slip op. 4, 7-9). Rather, mode-of-operation liability is applied only in limited circumstances that are not demonstrated here. These facts at hand may prove defendants breached their duty to plaintiff or that defendants had constructive notice of an inherently dangerous condition, but they do not reflect a danger posed by defendants' business operations.

We also note the judge specifically rejected inclusion of subpart 8 of the Model Charge addressing notice of a danger located on a business property, which provides:

> If you find that the land (or premises) was not in a reasonably safe condition, then, in order to recover, plaintiff must show either that the owner/occupier knew of the unsafe condition for a period of time prior to plaintiff's injury sufficient to permit him/her in the exercise of reasonable care to have corrected it, or that the condition had existed for a sufficient length of time prior to plaintiff's injury that in the exercise of reasonable care the owner/occupier should have discovered its existence and corrected it.

A-2884-12T4

[Model Jury Charges (Civil), 5.20F8, "Notice
of Particular Danger as Condition of
Liability" (1970).]

We conclude this charge properly addresses the liability question posed by the facts of this case. The jury should have been asked to consider whether plaintiff proved defendants breached their duty to provide a safe premises for invitees by failing to act when it knew or should have known of the danger posed by the rain on tile floors. The omission of the applicable legal standard from the jury instruction along with the inclusion of mode-of-operation liability charge was error. Because the jury charge used here was clearly capable of misleading or confusing the jury, we vacate the verdict and remand for a new trial.

C.

Defendants' final challenge attacks the evidentiary determinations by the court excluding the use of plaintiff's prior medical records on cross-examination. Defendants argue the trial court erred in limiting cross-examination of plaintiff and her expert regarding plaintiff's prior complaints and symptoms of back and neck pain.[5] As noted below, this record is

---

[5]   The record suggests some documents were marked for identification at trial. However, there is no differentiation among the sixty-three pages of records included in defendants' appendix from various providers treating plaintiff in 2002, 2004, 2005, 2006, 2007, 2009, and 2010. Many records are hand-written

insufficient to allow our definitive review of these issues.[6] However, because we have ordered a new trial, we include these comments for guidance if the matter arises on retrial.

At trial, plaintiff described her injuries. On cross-examination, she was asked whether she had made complaints of pain or sought medical treatment for these same areas of her body, prior to her fall. She responded she did not remember. Plaintiff was confronted with her deposition testimony, which unequivocally stated she had never sought treatment or complained of pain in her legs, neck, or back or for tingling or numbness in her arms. Defendants then proceeded to ask plaintiff if she sought medical treatment in 2002, after complaining of back pain, which was met by a hearsay objection.

---

and indecipherable. Treatments addressed varied conditions and complaints, among which were 2004 cervical spine x-rays, revealing "mild loss of intervertebral disc height" and "early spur formation"; cervical nerve impingement; neck and "upper back" pain, shoulder blade pain, left leg pain from bursitis; left knee pain and sprain after a fall in November 2009; left arm numbness; and a December 2010 fall down steps, resulting in a diagnosis of lumbar stenosis and degenerative joint disease.

[6] Generally, our review of a trial court's evidentiary rulings determines whether the judge properly exercised discretion. Villanueva v. Zimmer, 431 N.J. Super. 301, 310-11 (App. Div. 2013). It is only when the trial court "'fails to apply the proper test in analyzing the admissibility of proffered evidence'" that our review is plenary. Ibid. (quoting Konop v. Rosen, 425 N.J. Super. 391, 401 (App. Div. 2012)).

At sidebar, the judge rejected defendants' claim the documents were admissible as business records and sustained the objection, stating:

> So you're asking that the [c]ourt let in medical records without — just because it's for impeachment purposes because you found some medical record that perhaps may contradict her credibility . . . .
>
> But just interpreting that the findings of the doctor and the history that he took is the same as the injuries she claims about today that's what you want the jury to make a credibility determination to find that she's not credible because some other doctor made note that she had perhaps similar complaints to similar body parts. I don't think that's enough. That's just too much hearsay.
>
> . . . .
>
> I'm going to preclude you from using these notes to pick out another person's opinion without presenting the opinion of the doctor as to what the complaint resulted in after physical examination.

Hearsay statements are inadmissible unless they fall within a designated exception. N.J.R.E. 802. However, N.J.R.E. 803(c)(6) excepts from the hearsay rule

> [a] statement contained in a writing or other record of acts, events, conditions, and, subject to Rule 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of

A-2884-12T4

that business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

The business records exception "routinely permits the admission of medical records." Konop, supra, 425 N.J. Super. at 403. To qualify under the business record exception to the hearsay rule:

> [T]he proponent must satisfy three conditions: "First, the writing must be made in the regular course of business. Second, it must be prepared within a short time of the act, condition or event being described. Finally, the source of the information and the method and circumstances of the preparation of the writing must justify allowing it into evidence."
>
> [Ibid. (quoting State v. Sweet, 195 N.J. 357, 370 (2008)).]

With regard to the reliability of the source of information, this court has stated "'one of the critical circumstances importing reliability is the fact that the informant whose declaration is so recorded is under a duty, in the context of the activity in which the record is made, to make an honest and truthful report.'" Id. at 404 (quoting State v. Lungsford, 167 N.J. Super. 296, 309 (App. Div. 1979)). "'There is a presumption, absent contrary testimony, that those responsible for services to the public will carry out their duties in a proper, careful and prudent manner.'" Ibid. (quoting State v. Matulewicz, 101 N.J. 27, 31 (1985)).

In this matter, an objection was made to defendants' inquiry regarding plaintiff's prior medical treatment, after she asserted she had had none. That question, as posed, was not objectionable. Nor was the use of specific medical records to attempt to refresh plaintiff's recollection inappropriate, particularly as she stated she could not remember.

Courts have ruled pre-accident health records are admissible to test a plaintiff's credibility. See Ocasio v. Amtrak, 299 N.J. Super. 139, 155-59 (App. Div. 1997) (history of drug abuse and other personal issues was relevant to credibility of damage claim arising from personal injury); Allendorf v. Kaiserman Enters., 266 N.J. Super. 662, 674 (App. Div. 1993) (allowing introduction of "evidence that plaintiff had episodes of passing out prior to the accident[, which] was admissible for the purpose of impeaching the credibility of her testimony that she was 'in perfect health' and had never had 'any problem with blacking out' prior to the accident"). "It has long been the rule in New Jersey that the declarations of a patient as to his [or her] condition, symptoms and feelings made to his [or her] physician for the purpose of diagnosis and treatment are admissible in evidence as an exception to the hearsay rule." Cestero v. Ferrara, 57 N.J. 497, 501 (1971). See also N.J.R.E. 803(c)(4) ("Statements made in good faith for purposes of

medical diagnosis or treatment which describe medical history, or past or present symptoms, pain, or sensations" are "not excluded by the hearsay rule[.]").

On this record, we are unable to discern exactly what records or alleged statements attributed to plaintiff defendants sought to admit. First, no proffer was made identifying the specific records to be used. Defendants' obligation is to identify the specific record, or portion thereof, claimed to be exempt and demonstrate its admissibility. We do not fault the judge for rendering a general ruling when confronted for the first time at trial with voluminous records claimed to be business records. Second, the judge correctly identified the prospect of inadmissible hearsay imbedded within possibly admissible documents. See N.J.R.E. 805. If the issue arises on remand, the subject may be best analyzed by motion presenting a specific proffer and allowing a detailed review.

The judge also limited the use of plaintiff's past medical records during cross-examination of Dr. Tiedrich. Noting plaintiff had not provided her expert with any pre-accident treatment records, defendants presented Dr. Tiedrich with a September 6, 2007 x-ray report of plaintiff's lumbar spine. Plaintiff objected, maintaining the records were hearsay.

"Extensive cross-examination of experts is generally permitted, subject to reasonable limitations imposed by the trial court in its discretion." Nowacki v. Cmty. Med. Ctr., 279 N.J. Super. 276, 290 (App. Div.), certif. denied, 141 N.J. 95 (1995). Absent a showing of "clear error and prejudice[,]" this court will not interfere with the trial court's exercise of discretion. Ibid. (quoting Glenpointe Assocs. v. Twp. of Teaneck, 241 N.J. Super. 37, 54 (App. Div.), certif. denied, 122 N.J. 391 (1990)).

In Allendorf, this court found the defendant established the possibility of an alternative medical cause by confronting plaintiff's expert on cross-examination with facts concerning plaintiff's medical history. Allendorf, supra, 266 N.J. Super. at 672-74. The plaintiff alleged she suffered a seizure disorder after being injured by an elevator door. Id. at 667, 672. The defendant asked the plaintiff's neuropsychiatrist whether information about the plaintiff's complaints of "passing out" and severe chest pain prior to the accident would change her opinion concerning the cause of the plaintiff's alleged seizure disorder. Id. at 673. We held "[a] party seeking to present evidence of a prior injury or condition relating to an issue of medical causation must show that the evidence has some 'logical relationship to the issue in the case.'" Id. at 672

(quoting Paxton v. Misiuk, 34 N.J. 453, 460 (1961)). "[T]his logical relationship generally must be established by appropriate expert medical opinion." Ibid.

Here, the judge's prior ruling precluded defendants' inquiry of plaintiff regarding the nature of her 2007 back treatment necessitating x-rays. Were defendants able to establish the logical relationship of that treatment to her current complaints, the questions posed to the expert should have been permitted.

Following our review, we affirm the denial of defendants' motion for a directed verdict. However, we reverse the determination that mode-of-operation liability applied in this case. Accordingly, we vacate the verdict and remand for a new trial.

Affirmed in part; reversed in part; and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

**HOFFMAN, J.A.D., concurring in part and dissenting in part.**

I agree with the majority in rejecting defendants' challenges to the trial court's rulings denying their motion for a directed verdict, and limiting use of plaintiff's past medical records during cross-examination; however, I part company with my colleagues' finding of trial error in the inclusion of the mode-of-operation liability charge. Because I am satisfied the record supports the trial judge's decision to provide the jury with the mode-of-operation charge, I respectfully dissent.

As part of plaintiff's case, counsel read into the record the following deposition testimony from Cheryl Lynn Gross, an employee who held a position equivalent to district manager for eight KFC restaurants in New Jersey, including the one where plaintiff's accident occurred:

> Q:   How is the chicken cooked?
>
> A:   In split vat fryers.   It's an open fryer. . . .   And then you have pressure cookers and that's where the originals are cooked in the pressure cookers.
>
> Q:   Is there oil in the pressure cookers?
>
> A:   Yes.
>
> Q:   Is there oil in the split vat fryers?
>
> A:   Yes.

. . . .

Q:   Is the floor in the kitchen area tiled?

A:   Yes.

Q:   Are there any mats in the kitchen?

A:   No

Q:   Whatever goes on in the kitchen during
the course of the day[,] if there is
spillage or anything like that, it ends up
on the floor?

A:   Yes, and they mop it.

Q:   How often do they mop the kitchen?

A:   Maybe twice a day, three times a day
when they get oil on the floor.

Q:   And, if people are in the kitchen along
the cook line and there is oil on the floor,
they can get it on their footwear, correct?

A:   Possibly.

. . . .

Q:   [What] if they have to go to the
restroom or ladies room[,] they can be
tracking it?

A:   Possibly.

Plaintiff's counsel also provided the jury with the

following deposition testimony from Debbie Lovato, the assistant

manager who was present at the time of plaintiff's fall:

Q:   Do you remember when the rain started
and when it stopped without guessing?

A:   Not really, no.

2

Q: You don't remember the names of the other people who were there?

A: No, I do not. We have people come and go all the time.

. . . .

Q: You personally don't recall inspecting the floor yourself from two o'clock up until the time of the accident, correct?

A: Correct.

Q: Do you recall looking at or examining anyone else or asking them if they inspected the floor from the time you got on up until the time of the accident?

. . . .

A: I don't remember.

. . . .

Q: Did you go down on your hands and knees and inspect the floor to see what[,] if anything[,] was on the floor?

A: No.

Q: Did anybody else?

A: Not that I'm aware of, no.

. . . .

Q: Did you take a clean cloth or a rag or anything and wipe the floor after the incident to see what[,] if anything[,] was on the floor?

A: No, I did not.

On direct examination, Lovato explained the routine for cleaning the floor in the kitchen where the chicken is cooked, and the floor in the dining area, stating "we're color coded. We have a blue mop for the kitchen and we have a yellow mop that's strictly for the dining room . . . area."

The record indicates that KFC employees, including kitchen employees who attended to the open vat chicken fryers, used the same restroom facilities as the customers, through a common entrance.[1]  Despite this fact, defendants had no established policy requiring periodic inspections of the floors, either generally or in the area between the kitchen and restroom doors. Further, Lovato confirmed no inspection or mopping occurred during the four-hour period before plaintiff's accident.

Indeed, a business owner has a duty to provide a safe environment for its invitees.  Nisivoccia v. Glass Gardens, Inc., 175 N.J. 559, 563 (2003).  This duty of care "requires a business owner to discover and eliminate dangerous conditions, to maintain the premises in safe condition, and to avoid

_____

[1]  Although the record does not contain specific testimony regarding restroom usage by KFC workers on the date of plaintiff's accident, the restaurant had been open approximately seven hours by the time of her fall, a sufficient period of time to make it reasonably probable one or more workers would have used the restroom during that period.  Moreover, the record indicates the restrooms were checked every half hour when the customer tables were wiped.

creating conditions that would render the premises unsafe." Ibid. Because business operators are in the best position to prevent the risk of harm to their customers, it is fair to hold them responsible for injuries caused by their negligence. See Hojnowski v. Vans Skate Park, 187 N.J. 323, 335 (2006). Unlike the customer, "[t]he operator of a commercial recreational enterprise can inspect the premises for unsafe conditions, train his or her employees with regard to the facility's proper operation, and regulate the types of activities permitted to occur." Ibid.

Nevertheless, business owners are generally not liable for injuries caused by dangerous conditions of which they were not aware. Brown v. Racquet Club of Bricktown, 95 N.J. 280, 291 (1984). Ordinarily, the burden is upon the plaintiff to prove "that the defendant had actual or constructive knowledge of the dangerous condition that caused the accident." Nisivoccia, supra, 175 N.J. at 563.

When the very "nature of the business . . . creates the hazard," however, the "mode-of-operation rule" creates an inference of negligence and "shifts the burden to the defendant to 'negate the inference by submitting evidence of due care.'" Nisivoccia, supra, 175 N.J. at 564 (quoting Bozza v. Vornado, Inc., 42 N.J. 355, 360 (1964)). This inference relieves the

plaintiff of proving the defendant had actual or constructive notice of the dangerous condition and instead requires the defendant to show it did "all that a reasonably prudent [person] would do in light of the risk of injury [the mode-of-operation] entailed." Wollerman v. Grand Union Stores, Inc., 47 N.J. 426, 429 (1966). If the defendant provides no explanation, the facts presented by the plaintiff should allow a jury to find "from the condition of the premises and the nature of the business that [the defendant] did not exercise due care in operating the [business], and that said negligent operation was the proximate cause of [the plaintiff's] injuries." Bozza, supra, 42 N.J. at 359.

I agree with the majority that mode-of-operation liability does not apply merely because a defendant operates a fast food restaurant. Ante at ___ (slip op. at 17). I further agree the unifying factor in these cases is the defendants' method of business operation, but I disagree with the assertion that mode-of-operation liability is limited to businesses where customers use self-service facilities. Id. at 18. Instead, mode-of-operation liability applies where there is a "risk of injury

inherent in the nature of the defendant's operation." Wollerman, supra, 47 N.J. at 429-30.[2]

Plaintiff relies on Smith v. First National Stores, Inc., 94 N.J. Super. 462 (App. Div. 1967), to support her position that she did not need to present evidence defendant had notice of the substance on the floor on the day she fell because there was sufficient evidence for a jury to draw a legitimate inference that the greasy floor was caused by defendants' employees. In Smith, the plaintiff was a supermarket patron who slipped on an interior stairwell leading to a restroom. Id. at 464. Evidence was introduced at trial indicating that the meat department "was about five feet away from the foot of the stairway." Ibid. "[P]rior to the accident sawdust was commonly observed upon the stairway," which could have come from the meat or produce departments because employees frequently used those stairs to access the restroom. Id. at 464-65. Neither actual nor constructive notice was deemed necessary because evidence

---

[2] Although I do not share the majority's view that limits mode-of-operation liability to businesses that allow self-service, ante at ___ (slip op. at 18), I note the record does reflect that defendants' restaurant has a self-service soda fountain. While I believe the presence of this fountain reasonably charged defendants with notice that drink spills are likely to occur, I concede the record does not implicate the fountain in plaintiff's fall as she described the substance as "grease" and her daughter used the term "greasy." Thus, the record does not indicate a nexus between defendants' self-service soda fountain and the substance that caused plaintiff's fall.

7                                                          A-2884-12T4

existed the defendant had created a dangerous condition "through its agents and employees. . . ."  Id. at 466.  Essentially, the court found the plaintiff did not have to prove that the defendant had notice of the dangerous condition because evidence indicated the defendant itself created the hazard.  Ibid.

Here, the record indicates plaintiff's fall occurred about five feet outside of the restroom entrance.  Plaintiff testified that her hands hit the floor and it felt like the floor had grease mixed with water on it.  Plaintiff's son Richard testified, "I went over to her and I tried to pick her up but I started to slip also.  So Adriana, my sister[,] ran over also and tried to guide her up  [but] [s]he started to slip[.]"  Richard and Adriana required the assistance of another patron in the restaurant to finally get their mother up.  Adriana testified the floor "was wet and it felt like it was greasy.  I've actually worked in a restaurant as well and it just felt like it was just greasy and it wasn't mopped properly."

The record clearly shows that KFC was aware the kitchen floor required special attention as evidenced by the practice of having separate mops for use in the kitchen and dining areas.[3]

---

[3]  While color-coded mops demonstrated some effort by KFC to address the problem posed by grease in the kitchen, it also highlighted the difficulty in effectively cleaning grease so as to prevent workers from tracking grease into the dining and restroom areas.

Because workers in the kitchen used the same restrooms as patrons of the restaurant, the area between the kitchen and the restrooms could reasonably be expected to encounter grease from the workers' shoes when they used the restroom facilities.[4] Just as KFC had actual notice of the condition of the kitchen floor and had taken steps to address it, we can infer that KFC had constructive notice of the condition of the floor between the kitchen and the restrooms as well. It was "circumstantially inferable" that the presence of the greasy substance described by plaintiff and her children was "substantially attributable" to the use of the restrooms by the workers in the kitchen. Smith, supra, 94 N.J. Super. at 465.

I do not find the majority's attempt to distinguish Smith persuasive. Ante at ___ (slip op. at 27-29). In Smith, the store manager "testified that the purpose of the sawdust around the meat department was to 'keep the meat floor from a sliding condition,'" and we concluded it was thus "inferable that such sawdust would pick up meat or fat droppings." Smith, supra, 94 N.J. Super. at 465. Here, the testimony of defendants' district manager acknowledged that oil on the floor could be tracked outside the kitchen. Although she tried to minimize the impact

---

[4] The properties and hazards posed by kitchen grease are common knowledge and well within the ken of the average juror.

of her responses by indicating "possibly," neither the jury nor the judge was obligated to accept this self-serving qualification when it flies in the face of logic and human experience. Simply put, when persons get cooking oil or grease on the soles of their shoes, one can reasonably expect they will track that substance as they walk about, leaving residue.

I see no significant distinction between the sawdust used by the meat department in Smith and the multi-colored mops used by KFC. Each represented a well-intentioned, but far-from-perfect, effort to address problems posed by the tracking of substances that reach the floor in the preparation of food. The sawdust used almost fifty years ago to address the problem posed by a greasy, slippery floor may seem rudimentary today; however, aside from the plaintiff's accident, there is no indication of any other accidents in Smith, even though the stairway where the accident occurred was used 180 times a day for all employees, as well as an unstated number of patrons, like the plaintiff. Ibid. While the sawdust may have been effective most of the time, the evidence was, nevertheless, "such that a jury could legitimately conclude that the greasy, slippery state of the stairway in reasonable probability resulted from the tracking of the sawdust upon the stairway — not by customers — but by defendant's own employees." Id. at 466.

Similarly here, while the multi-colored mops may have been effective most of the time, the evidence was such that a jury could conclude with reasonable probability that the greasy, slippery floor outside the ladies restroom where plaintiff fell, resulted from the tracking of oil or grease from KFC's kitchen by defendants' own employees. Plaintiff described the floor where she fell as "grease and water" and her daughter used the term "greasy"; their testimony, if found credible by the jury, was certainly competent to establish the dangerous condition of the floor related to defendants' mode of operation.

I believe the majority places undue emphasis upon the court in Smith expressing "some doubt" as to the "complete applicability" of mode-of-operation liability to the facts presented there. Id. at 466 (emphasis added). Unfortunately, the court in Smith did not provide any explanation for its reservation. Ibid. Nevertheless, such language hardly constituted a complete rejection of the applicability of the doctrine. Instead, the court in Smith chose to reverse on the narrow basis that the evidence at trial could support the conclusion that the slippery stairway resulted from the tracking of sawdust by defendant's own employees. Ibid.

The majority interprets Nisivoccia as indicating a limitation of the mode-of-operation doctrine to proprietors

whose business model "encourages self-service on the part of the customer." Ante at ___ (slip op. at 30). While Nisivoccia did involve a slip and fall in a supermarket on grapes loosely packaged for sale, Nisivoccia, supra, 175 N.J. at 562, the Supreme Court made no express statement limiting the mode-of-operation rule to self-service businesses:

> The Model [Jury] Charge correctly states the rule that when a substantial risk of injury is inherent in a business operator's method of doing business, the plaintiff is relieved of showing actual or constructive notice of the dangerous condition. The plaintiff is entitled to an inference of negligence, shifting the burden of production to the defendant, who may avoid liability if it shows that it did "all that a reasonably prudent man would do in the light of the risk of injury [the] operation entailed."
>
> [Id. at 564-65 (quoting Wollerman, supra, 47 N.J. at 429).]

Given the well-recognized risks to the health and safety of both patrons and workers posed by a greasy, slippery floor,[5] I see no sound reason to impose the majority's limitation on the mode-of-operation doctrine.

---

[5] See, e.g., a recent study of fast food restaurants, which highlighted the magnitude of the risk presented by walking on a contaminated floor, finding it increased the rate of slipping by 14.6 times. Santosh K. Verma et al., Rushing, distraction, walking on contaminated floors and risk of slipping in limited-service restaurants: a case-crossing study, 68 Occupational & Envtl. Med., no 8, 551, 575-81 (2011) as reported in Liberty Mutual Research Institute for Safety, Slips and Falls in Restaurants: Reducing Worker Risk, 14 Scientific Update: From Research to Reality, no 1, 1, 6 (2011), http://www.libertymutualgroup.com.

Further, the equitable considerations that underlie the mode-of-operation cases apply to the present case and justify shifting the burden to KFC. After plaintiff fell, the assistant store manager chose not to kneel down to inspect the floor where plaintiff fell; neither she, nor any other employee, wiped the floor with a cloth or rag to see what may have caused plaintiff's fall. Additionally, KFC failed to preserve the restaurant log book in which the assistant manager documented the incident.

"The customer is hardly in a position to know precisely [what] was the neglect." Wollerman, supra, 47 N.J. at 429. "It is just, therefore, to place 'the onus of producing evidence upon the party who is possessed of superior knowledge or opportunity for explanation of the causative circumstances.'" Ibid. (quoting Kahalili v. Rosecliff Realty, Inc., 26 N.J. 595, 606 (1958)).

Because KFC's mode of operation allowed its workers in the kitchen, including those workers who fry the chicken in cooking oil in deep vat fryers and pressure cookers, to use the same restrooms as restaurant patrons,[6] the burden was appropriately

_____

[6] I acknowledge the economic benefit for restaurant operators if they are able to have their workers use the same restrooms provided for patrons. Such "economic considerations, however, cannot supplant the bedrock safety obligations and duties of a

shifted to KFC to prove it took "reasonable measures to guard against injuries to customers." Craggan v. IKEA USA, 332 N.J. Super. 53, 62 (App. Div. 2000)(quoting O'Shea, supra, 304 N.J. Super. at 493).

I conclude the facts before the jury raised legitimate inferences that plaintiff's fall was caused by grease on the floor related to defendants' mode of operation, where workers, exposed to the oil and grease in the kitchen, were not provided with a separate bathroom but were required to use the restrooms provided for patrons. By its verdict, the jury concluded defendants breached its duty to plaintiff to keep the premises reasonably safe.

Because I conclude the record supports the decision of the trial judge to give the mode-of-operation charge, and the jury charge on the whole accurately stated the law applicable to the contested evidence in this case, I would affirm the jury's verdict. See Mogull v. CB Commercial Real Estate Group, 162 N.J. 449, 464 (2000).

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

retail proprietor to a customer." O'Shea v. K Mart Corp., 304 N.J. Super. 489, 495 (App. Div. 1997).